James F. **BARNHART**, Plaintiff–Appellant,

v.

**PICKREL, SCHAEFFER & EBELING COMPANY, L.P.A., et al.,** Defendants–Appellees.

No. 92–3622.

United States Court of Appeals, Sixth Circuit.

Argued June 29, 1993.

Decided Oct. 21, 1993.*

---

* This decision was originally issued as an "unpublished decision" filed on October 21, 1993.

Andrew J. Ruzicho (argued on brief), Columbus, OH, for plaintiff-appellant.

Konrad Kircher (argued), David C. Greer (on brief), Dayton, OH, for defendants-appellees.

Before: RYAN and BOGGS, Circuit Judges; and ROSEN, District Judge.**

PER CURIAM.

Plaintiff James F. Barnhart appeals the decision of the district court granting Defendants' motion for summary judgment on Plaintiff's claim under the Age Discrimination in Employment Act ("ADEA"). Plaintiff, formerly an attorney with the Defendant law firm, alleged in his complaint that the Defendant firm, as well as each Defendant shareholder individually, wrongfully terminated his employment with the firm because of his age and, alternatively, because of his handicap (alcoholism). Plaintiff claimed a violation of the ADEA, as well as breach of contract, promissory estoppel, and handicap discrimination under Ohio state law. The district court granted Defendants' motion for summary judgment on the ADEA claim, and it dismissed without prejudice the remaining supplemental claims. Plaintiff now appeals only the denial of relief under ADEA, as he has refiled his remaining claims in Ohio state court.

Finding that Plaintiff has failed to demonstrate that Defendants' non-discriminatory reasons for terminating Plaintiff were pretext, we affirm.

## I.

Plaintiff James F. Barnhart worked for the Defendant law firm of Pickrel, Schaeffer, & Ebeling for thirty-two years. Barnhart first joined the firm as an associate attorney in 1957. He later left the firm for several years but, in 1976, upon payment of $21,700, Barnhart rejoined Pickrel, Schaeffer, & Ebeling as a senior partner. When the firm incorporated under Ohio law in 1984, Barnhart became an executive attorney and shareholder, entitling him to a share of the firm's profits. The firm's president appointed Barnhart as head of the firm's litigation department in 1987, and Barnhart worked for the firm in this capacity until his termination in 1989.

Throughout much of Barnhart's tenure with the Defendant firm, he waged a constant battle against a severe drinking problem. Between 1972 and 1983, Barnhart consumed alcohol on an almost daily basis. By 1980, he admits, he drank alcohol in such quantities and with such frequency as to render himself an alcoholic. Several doctors concurred in Barnhart's self-diagnosis.

Barnhart contends that he first became cognizant of his drinking problem in 1979. Realizing at that time that alcohol interfered with his life, he attended several Alcoholics Anonymous meetings over the course of a one-month period. These self-help meetings did little, however, to stem Barnhart's excessive drinking. Throughout the early 1980's, he continued to consume alcohol on an almost daily basis.

Beginning in 1982, Barnhart made several attempts to seek rehabilitative treatment for his drinking problem. In January of 1982, he checked into Miami Valley Hospital's detoxification program, but left the program after three days. Barnhart again admitted himself to the Miami Valley detoxification program in January of 1983, shortly after Kettering, Ohio police charged him with Driving Under the Influence (DUI). Again, however, he stayed for only three days.

In July of 1983, Barnhart entered Kettering Medical Center for further treatment of his alcohol addiction. He later entered Ridgeview Institute, a chemical dependency treatment center in Georgia, for a period of three weeks. Although doctors at Ridgeview recommended that he enroll himself in a halfway house after his release, Barnhart ignored the doctors' advice.

Apparently, Barnhart successfully curbed his inebriate tendencies for some time following his release from Ridgeview Institute. However, he recommenced his abuse of alcohol in October of 1986. As a result of this relapse, he entered Sycamore Hospital in Dayton, Ohio for further treatment of his alcohol addiction.

** The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

The record indicates that the entire Defendant law firm knew of Barnhart's abuse of alcohol as early as 1983. Several individual shareholders spoke to Barnhart about his problems with alcohol on various occasions during the early and mid 1980's. In August of 1987, the Board of Directors firmly chastised Barnhart for his continuous consumption of alcohol and his deteriorating job performance.

Despite the Board of Directors' concern with Barnhart's behavior and work capacity, the firm's president appointed Barnhart head of the firm's litigation department in the fall of 1987. Even in this role, however, Barnhart continued drinking. In fact, he appeared at the office less frequently and his workload decreased. Also, in April of 1989, the Dayton Bar Association filed an ethics complaint against him for drinking-related activities.

In August of 1989, after experiencing a short period of episodic drinking, Barnhart readmitted himself to the Kettering Medical Center. Subsequent to Barnhart's readmission to the Kettering treatment facility, the Defendant shareholders voted to suspend him from the firm and divide his share of the firm's profits from August 26 to December 31, 1989. In a letter dated August 25, 1989, the shareholders explained to Barnhart that later reinstatement with the firm was contingent upon his seeking "rehabilitative treatment appropriate to [his] chronic alcohol abuse." The letter stated:

> By unanimous decision of your fellow Shareholders of Pickrel, Schaeffer & Ebeling Co., L.P.A., you are required to suspend your practice of law, take a leave of absence, and devote yourself to rehabilitative treatment appropriate to your chronic alcohol abuse. You are to keep the firm informed concerning your treatment and its progress. Your compensation of 9.5% of profits will be pro-rated to August 25, 1989. For the duration of your leave of absence in 1989, your bi-weekly draw against your share of profits will be continued, subject to offset by any disability insurance payments you may receive on policies paid for by the firm.

> Paul Winterhalter, as acting Chairman of the Litigation Department, will monitor and supervise your current legal work and case load. At the end of the year, your fellow Shareholders most sincerely hope that your progress will allow you to be back where you should be, which is practicing law with Pickrel, Schaeffer & Ebeling. This decision will be made by the firm based upon our evaluation of your progress.

After receiving the letter of suspension, Barnhart admitted himself to inpatient rehabilitative treatment at Shepherd Hill Hospital. He also signed a consent form giving the firm the right to examine his medical records and monitor the course of his treatment.

Barnhart abandoned the Shepherd Hill alcohol treatment program prior to the course's termination (he stayed for twenty-five days of the twenty-eight day program), allegedly because his insurance coverage had run out. The Shepherd Hill doctors recommended that he continue treatment at its half-way house for an additional 90–180 days and attend a weekly after-care program, but Barnhart declined. Barnhart also refused to give the firm access to his Shepherd Hill medical records.

On October 5, 1989, Barnhart drafted a memorandum to the shareholders formally requesting reinstatement. The shareholders indicated to Barnhart in several response communications that a release of his Shepherd Hill medical records was a prerequisite to any consideration concerning his possible reinstatement.

Barnhart contends that he made several attempts to supply the firm with the requested medical information. He admitted at his deposition that he refused to grant the firm carte blanche review of his records per the initial agreement. However, he maintains that he suggested that a third party review the records and discuss them with the shareholders. Barnhart also asserts that he authorized release of the Shepherd Hill doctors' treatment analysis and recommendations. He contends that the shareholders rebuked both of these offerings.

During the pendency of his request for reinstatement, individual shareholders, on a few occasions, asked Plaintiff to consider retiring.[1] Barnhart continually rejected these suggestions, telling the shareholders that he could not afford to retire.

On November 15, 1989, citing Barnhart's refusal to follow his prescribed treatment, as well as his unwillingness to honor the agreement concerning his medical records, the shareholders rejected Barnhart's request for reinstatement. Subsequent to its rejection of Barnhart's request for reinstatement, the firm, on December 12, issued letters of intent to Andrew Storar (age 37) and John Slagle (age 43) to become shareholders effective January 1, 1991. Also effective January 1, 1991, the firm removed name partner Harry Ebeling (age 59) as a shareholder participating in the firm's profits and placed him on salary.

At the December 14, 1989 shareholders' meeting,[2] the shareholders discussed Barnhart's future status with the firm. They determined that a date (unspecified) must be set for Barnhart's compliance with the Shepherd Hill recommendations. They also decided that Barnhart's failure to comply would necessitate his expulsion from the firm. Following Barnhart's repeated refusals to comply in late December, 1989, and early January, 1990, the firm terminated him at the close of a January 11, 1990 shareholders' meeting.

## II.

In his complaint, Barnhart alleged that the Defendants wrongfully terminated his employment with the firm because of his age and his alleged handicap (alcoholism). Barnhart claimed a violation of ADEA, breach of contract, promissory estoppel, and handicap discrimination under Ohio state law.

The district court dismissed without prejudice all of Barnhart's supplemental claims and granted Defendants' motion for summary judgment on Barnhart's ADEA claim. Although the court determined that Barnhart established a *prima facie* case of age discrimination, it found as a matter of law that Barnhart could not prove by a preponderance of the evidence that Defendants' legitimate and non-discriminatory reasons for terminating him were pretext.[3] Barnhart now appeals the district court's grant of summary judgment to this court.

## III.

Barnhart contends that the district court erred in granting Defendants' motion for summary judgment. He posits two arguments: (1) The court erred in its application of the standard for granting summary judgment by weighing Plaintiff's evidence rather than determining whether a genuine issue of material fact exists; and (2) Plaintiff demonstrated by a preponderance of the evidence that Defendants' proffered legitimate and non-discriminatory reasons for expelling him were pretext.

In support of his first argument, Barnhart contends that the district court did not reach a decision granting summary judgment by determining that no genuine issue of material fact existed. Instead, Barnhart argues, the court reached a decision granting summary judgment by weighing the evidence supporting age discrimination against the evidence supporting a decision based on his alcoholism and determined that the evidence supporting the latter claim was "heavier" than the evidence supporting the former.

In support of his second argument, Barnhart offers two pieces of "evidence" that Defendants' proffered legitimate and non-discriminatory reasons for expelling him were pretext. First, Barnhart argues that the

1. Barnhart was 61 years of age at the time of his suspension and subsequent firing. The firm's by-laws provided for the mandatory retirement of each firm attorney at the age of 70, but the firm was considering amending that by-law to require retirement at age 65.

2. Although Barnhart was invited to attend the meeting, he declined.

3. The district court recognized that Defendants' legitimate reasons included reduction in quality of job performance due to alcohol abuse and non-cooperation (i.e., Barnhart's failure to follow the Shepherd Hill doctors' recommendations and his failure to provide the firm with adequate information regarding his treatment).

proffered reasons for his firing—reduction in quality of job performance due to alcohol abuse and non-cooperation—were without factual support. Barnhart admits that his case work production declined in the mid to late 1980's, but he contends that this decline was attributable to non-alcohol related illnesses and his increased duties and responsibilities as head of the litigation department. He also contends that the shareholders never questioned his competence as an attorney and that his job performance did not become an issue until after he refused the shareholders' request that he retire.

Additionally, Barnhart claims that he complied fully with the conditions made prerequisite to his reinstatement. He maintains that he sought appropriate help for his alcohol problem and made the appropriate medical records and recommendations available to the firm. The firm, he contends, simply chose to ignore the records because of their underlying desire to fire him on account of his old age.

Second, Barnhart argues that the record contains a substantial amount of circumstantial evidence suggesting that his age was the underlying motive in Defendants' decision to terminate him. Barnhart first points to the fact that several shareholders suggested that he take an early retirement. He maintains that these overtures are evidence of the firm's desire to discriminate against him because of his age. Next, Barnhart points to the fact that the shareholders allegedly were discussing reducing the firm's mandatory retirement policy from age seventy to age sixty-five. He maintains that this action is a *per se* violation of ADEA and as such demonstrates Defendants' age-based intent. Finally, Barnhart contends that the firm's hiring of two younger shareholders approximately one month prior to his discharge is evidence that the shareholders intended to fire him on account of his age.

Defendants counter by arguing that the district court correctly applied the standard for summary judgment and appropriately found no genuine issue of material fact that

Defendants' reasons for discharging Barnhart were his poor job performance due to alcohol abuse and non-cooperation. Thus, Defendants contest Barnhart's claims that an ulterior age-based motive inspired his firing.

## IV.

### A.

■ This court reviews *de novo* a district court's grant of summary judgment, applying "the same test as that used by the district court in reviewing a motion for summary judgment." *Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1161 (6th Cir.1988). Thus, the court should grant summary judgment if there is no genuine issue of material fact.

In the instant case, the district court properly applied the summary judgment standard. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions—*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[4] According to the *Celotex* Court,

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

---

**4.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, et al., *Federal Practice & Procedure,* § 2727, at 33 (1993 Supp.).

that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

 After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted).

Barnhart's contention that the district court failed to apply the aforementioned principles in granting Defendants' motion for summary judgment is without merit.

A reading of the district court's Opinion reveals that the district court did not "weigh" Barnhart's evidence prior to granting Defen-

dants' motion for summary judgment. At no place in the Opinion does the court compare the merits or the relative soundness of Barnhart's concurrent claims of age and handicap discrimination. Nor did the lower court make a determination that the evidence supporting the age discrimination claim is any stronger than the evidence supporting the charge of handicap discrimination. In fact, the district court's Opinion makes no reference at all to Barnhart's handicap discrimination claim short of the court's introduction to the entire suit.

 Rather, the court correctly applied the standard for summary judgment and appropriately found no genuine issue of material fact. Following Barnhart's establishment of a *prima facie* case, Defendants proffered several reasons for Barnhart's expulsion. The district court determined that Defendants' proffered reasons were legitimate and non-discriminatory. [District Court Opinion, p. 5–7.] The burden of persuasion then shifted back to Barnhart to demonstrate that Defendants' proffered reasons for expelling him were pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The court determined that Barnhart "offered no evidence to rebut [Defendants'] commonsense interpretation of the evidence." [District Court Opinion, p. 9.] Applying the law established in *McDonnell Douglas* and *Burdine*, the district court entered summary judgment.

### B.

Although this court finds that Barnhart sufficiently set forth a *prima facie* case of age discrimination, summary judgment was proper because Defendants proffered two legitimate and non-discriminatory reason for termination—deterioration of work and failure to cooperate—and Barnhart failed to demonstrate by a preponderance of evidence that those reasons were pretext.

Congress amended the ADEA in 1978 in an attempt to "broadly prohibit arbitrary discrimination in the workplace based on

age." *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978). The Act provides in pertinent part:

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; . . . .

29 U.S.C. § 623(a)(1).

■ It is well established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of age-based employment discrimination. *See McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. at 1819 (citations omitted); *see also Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 941 (6th Cir. 1987). Under *McDonnell Douglas,* a plaintiff can establish a *prima facie* case of age discrimination by showing by a preponderance of the evidence that: (1) he was a member of the protected class (age forty to seventy); (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was treated worse than a younger person. Plaintiff may also show through circumstantial, statistical, or direct evidence that he has been discriminated against. *See Blackwell v. Sun Electric Corp.,* 696 F.2d 1176, 1180 (6th Cir.1983).

■ If a plaintiff proves the four *McDonnell Douglas* elements or demonstrates other direct or statistical proof of discrimination, he raises a rebuttable presumption of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824 (citations omitted). As the Court explained in *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (citations omitted).

■ Once plaintiff establishes a *prima facie* case of discrimination, the burden of production then shifts to the defendant employer to provide a legitimate non-discriminatory reason for the action taken. *Id.* If the defendant fails to proffer any legitimate non-discriminatory reason for plaintiff's expulsion, the court must enter judgment for the plaintiff because no issue of material fact remains in the case. *Id.* If, however, Defendant produces evidence that he rejected plaintiff for a legitimate non-discriminatory reason, the burden of persuasion then shifts back to the plaintiff. *Id.*

■ The plaintiff retains the ultimate burden of persuasion in an employment discrimination case. If the defendant employer offers evidence of a legitimate non-discriminatory reason for a plaintiff's firing, plaintiff, in order to withstand a motion for summary judgment, must "demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Id.*

■ Generally, there are three ways in which an employment discrimination plaintiff may show that his employer's proffered reasons for dismissing him are pretext. The employment discrimination plaintiff may demonstrate pretext by showing: (1) that the stated reasons for his firing had no basis in fact; (2) that the stated reasons for his firing were not the actual reasons; and (3) that the stated reasons for his firing were insufficient to explain the discharge. *See Chappell v. GTE Products Corp.,* 803 F.2d 261, 265 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987); *Wheeler v. McKinley Enterprises,* 937 F.2d 1158 (6th Cir.1991).

In the instant case, Plaintiff attempts to demonstrate pretext, if at all, under the first two methods. Thus, first, the court must look to see whether Defendants' proffered reasons for firing Barnhart are supported by the record and second whether Barnhart has demonstrated that the proffered reasons were not the actual reasons.

### 1.

Defendants' proffered reasons for Barnhart's termination are supported by the record, since Barnhart's work performance deteriorated well in advance of Defendants' statements requesting his retirement. Contrary to Barnhart's assertions, the record is replete with examples of his deteriorating work performance. The record also indicates that several members of the firm expressed growing concern with Barnhart's alcohol abuse, as well as his decreased productivity, prior to the individual shareholders' requests for Barnhart's retirement in October of 1989.

The record clearly demonstrates that several members of the firm harbored concern over Barnhart's drinking problem well before 1989. Managing partner Ken Legler noted concern with Barnhart's drinking as early as 1983. [Barnhart Deposition at 106–107.] Andrew Storar also stated that he first became concerned with Barnhart's behavior in 1983, when Barnhart missed a deposition because he was intoxicated. [Storar Deposition at 16–17.] Storar maintains that his concern again manifested in 1987, when he thought Barnhart was intoxicated during a trial. *Id.*

The record also indicates that several members of the firm confronted Barnhart about both his drinking and the effect that it had upon his work performance prior to any invitations for his retirement. Brad Schaeffer, a former shareholder, accused Barnhart of becoming intoxicated while on the job in 1987 and spoke with Barnhart regarding his drinking, particularly his drinking during a malpractice case. [Barnhart Deposition at 115–117, 136–137.] The firm president, Gordon Savage, also spoke with Barnhart about this indiscretion. Both Schaeffer and Savage, in 1987 and 1989 respectively, suggested to Barnhart that he seek professional help for his drinking problem. [Barnhart Deposition at 137, 142.]

Following allegations of Barnhart's on-the-job drinking in 1987, the shareholders addressed a letter to Barnhart in which they reprimanded him for his drinking and the pronounced effect that it had begun to exact upon his recent job performance. That letter stated, in pertinent part:

We are writing this letter to you first, as your friends and second, as your fellow shareholders. As such, we are seriously concerned with your ability to continue to practice law and attend to the duties and responsibilities which you have—first, to your clients, and second, to your fellow shareholders. . . .

Many of us recall that, in the past, you were unable to devote the time, effort, skill and ability necessary to properly perform your responsibilities as an attorney. We do not want to see a return to such conduct. But, we are now seeing a return to the drinking activity which causes such conduct on your part. We have all observed that despite your promises to us that you would *not* have another drink . . . you have started to drink again. First, we observed you drinking during the work day. Now, you are starting to take more time off work. In sum, we again see the signs that your drinking will cause problems in your ability to continue to properly perform your duties and responsibilities both to clients and your fellow shareholders. . . .

Jim, we recognize that alcohol dependency is a sickness. We have endeavored to work with you in the past to help yourself. We will continue to work with you and help you in every way *if* you give evidence that you will again try to help yourself. We want to give you every reasonable opportunity to help yourself.

[Letter from firm to Barnhart, August 27, 1987.]

The shareholders also chided Barnhart for his inebriant tendencies in the August 25, 1989 letter of suspension:

By unanimous decision of your fellow Shareholders . . . you are required to suspend your practice of law, take a leave of absence, and devote yourself to rehabilitative treatment appropriate to your chronic alcohol abuse. You are to keep the firm informed concerning your treatment and its progress. . . .

At the end of the year, your fellow Shareholders most sincerely hope that your progress will allow you to be back where

you should be, which is practicing law with Pickrel, Schaeffer, & Ebeling. This decision will be made by the firm based upon our evaluation of your progress.

[Letter from firm to Barnhart, August 25, 1989.]

By Barnhart's own admission, excessive consumption of alcohol interfered with his job performance in the early and mid 1980's. [Barnhart Deposition at 129.] Barnhart admits that he often drank alcohol while practicing his professional duties. *Id.* at p. 71–73. He also admits that he was "drinking too much." *Id.* at p. 67. In fact, after inpatient treatment for alcoholism in 1986, Barnhart met with several shareholders, acknowledged that he was an alcoholic, and conceded that prior to his treatment in 1986, his life had become unmanageable. [Barnhart Deposition at 115–117.]

Barnhart's appointment to head of the litigation department in the fall of 1987 does not detract from the above analysis. That an attorney is given different or greater job responsibilities within a law firm does not necessarily indicate that the attorney was performing his duties at or beyond their expected level and does not necessarily indicate that he was "promoted." Firms will often change an attorney's job title or responsibilities for reasons other than exemplary work performance. A firm may, for instance, alter an attorney's responsibilities in an effort to streamline his practice or refocus his attention to more firm-related administrative activities. Also, a firm may change an attorney's responsibilities in order to encourage him to regain his zeal for the law. It is this latter explanation that the firm offers for Barnhart's appointment to head of the litigation department in 1987.

Further, regardless of what Barnhart's appointment as head of the litigation department says about his job performance prior to 1987, the record indicates that his job performance clearly deteriorated in the years immediately following. According to Defen-

dants' affidavit testimony, Barnhart's billable hours decreased by some 900 hours in 1987, he failed to hold several mandatory meetings with the members of the litigation department, and in April of 1989, an ethics complaint was filed against Barnhart with the Dayton Bar Association for activity involving his drinking.

Barnhart admits that his workload decreased in the late 1980's, but he contends that such is attributable to non-alcohol related illnesses and his increased job duties as head of the litigation department. Barnhart's own testimony, however, demonstrates that alcohol abuse accounted for his poor job performance. Barnhart confesses that by the time he went to Shepherd Hill in the summer of 1989, alcohol seriously hindered his job performance. [Barnhart Deposition at 129, 152; Dr. Karaffa Deposition at 15.] He admits that he did not spend as much time in the office as he should have and that by mid–1989 his case load fell from well over a hundred to roughly a dozen files. [Barnhart Deposition at 129, 152.]

In addition, when the shareholders suspended Barnhart in August of 1989, he admitted that he "came to the realization that in addition to being powerless over alcohol, my life had become unmanageable." He thanked the shareholders for "having taken the action which you took to force me into a recovery program," while noting that the decision to do so was "difficult but yet necessary". [Letter from Barnhart to shareholders, October 5, 1989.]

The foregoing evidence clearly indicates that the quality of Barnhart's job performance deteriorated well before various members of the firm requested his retirement. The evidence also indicates that the firm expressed concern regarding both Barnhart's drinking and his deteriorating job performance, prior to any suggestion that he voluntarily retire.[5]

█ Defendants' other main reason for Barnhart's discharge, failure to cooperate

---

5. Plaintiff's argument that Defendants "admit" that they did not terminate him because of poor performance is without merit. Although in response to an interrogatory requesting all the reasons for the discharge, Defendants merely listed

Plaintiff's refusal to rid himself of alcoholism, clearly, Defendant's concern about Plaintiff's alcoholism stems from their concern about his work.

with the firm, is also supported by the record. The record clearly indicates that Barnhart failed to comply with the conditions made prerequisite to his potential reinstatement. Barnhart refused to follow recommended after-care treatment prescribed by his treating physician and reneged on his agreement to update the firm adequately concerning the status of his rehabilitative therapy.

Following receipt of his suspension letter, Barnhart independently selected and made arrangements for inpatient treatment at Shepherd Hill Hospital. [Barnhart Deposition at 156–158.] From the beginning, however, he rebuffed the doctors' various offerings of treatment. [Barnhart Deposition at 105; Dr. Karaffa deposition at 26–27.] On the second day of treatment, he demanded his release from the facility and remained only when threatened with arrest. [Barnhart deposition at 106–107.] On the third day of treatment, he again demanded his release, which was refused when his wife demanded that he not be discharged. *Id.* at 107–109.

Barnhart ultimately left Shepherd Hill prior to the termination of his treatment program. *Id.* at 120. The Shepherd Hill doctors recommended that he continue treatment at its half-way house for an additional 90–180 days and attend a weekly after-care program, but Barnhart refused. [Shepherd Hill Discharge Instructions.]

Rather than admitting himself to treatment at the Shepherd Hill half-way house, Barnhart opted to become an outpatient at Dartmouth Hospital, where he attended alcohol counseling sessions twice weekly from November 1989 until June 1990. Instead of enrolling in an after-care program, Barnhart, upon the advice of a local judge, attended Alcoholics Anonymous.

At the outset of his treatment, Barnhart signed a consent form, which permitted the Defendant law firm to remain informed regarding his treatment. Following his early release from Shepherd Hill, though, Barnhart formally revoked consent for the release of his Shepherd Hill medical records. [Letter from Barnhart to shareholders, September 7, 1989.] According to Dr. Karaffa,

Barnhart feared that if the firm learned of his refusal to follow Shepherd Hill's recommendations, he would be discharged.

The firm informed Barnhart on several occasions after his release from Shepherd Hill that access to his medical records was a condition prerequisite to his reinstatement. [Letter from shareholder Zimmer to Barnhart, October 10, 1989; Letter from shareholder Zimmer to Barnhart, October 19, 1989.] Barnhart, however, ignored these communications.

Barnhart contends that he eventually made several attempts to supply the firm with the requested medical information. He maintains that he suggested a plan to disclose the records to a third party to review and discuss with the shareholders. Barnhart also maintains that he authorized release of the Shepherd Hill doctors' recommendations. What Barnhart fails to mention, however, is that all along he still refused to provide a release that would permit the Shepherd Hill doctors to discuss their recommendations with the shareholders. Without being able to consult Barnhart's doctors, the shareholders would have no way of monitoring Plaintiff's progress.

In addition, the record indicates that despite Barnhart's alleged good-faith attempts to convey the Shepherd Hill recommendations to the shareholders, Barnhart never actually planned on following the recommendations. On November 30, 1989, Barnhart attempted to convince the doctors at Shepherd Hill to change their recommendations concerning his after-care. [Dr. Karaffa Deposition at 74–76.] The doctors, however, refused. *Id.* at 74–76. In December 1989, Barnhart again unsuccessfully attempted to convince the Shepherd Hill doctors to change their recommendations. *Id.* at 77.

Barnhart even conveyed his intent not to follow the Shepherd Hill recommendations to the shareholders themselves. In a letter to firm president Gordon Savage, dated December 27, 1989, Barnhart maintained that the Shepherd Hill recommendations were without merit, and he insisted that it was his intent to continue his treatment as an outpatient at Dartmouth Hospital. [Letter from

Barnhart to Savage, December 27, 1989.] Barnhart manifested this same intent at the time of the January 11, 1990 shareholders meeting. Thus, at the close of that meeting, the shareholders voted to terminate him.

In sum, the aforementioned evidence indicates that Defendants' proffered reasons for Barnhart's discharge—deterioration of work performance and non-cooperation—are well supported by the factual record.

**2.**

Having found that Defendants' legitimate, non-discriminatory reasons for Barnhart's discharge are established by the record, the court must assess whether Plaintiff has shown a material factual dispute on the issue of whether Defendants' proffered reasons were the actual reasons for the discharge.

■ Barnhart contends that Defendants' reasons are pretext, and as evidence that the true reason Defendants discharged him was because of his age, Barnhart offers two pieces of evidence: (1) that certain Defendant shareholders requested he take an early retirement; and (2) that the Defendant law firm was considering lowering its mandatory retirement age from seventy to sixty-five. The court finds that neither contention sufficiently rebuts Defendants' legitimate and non-discriminatory explanations.

The record demonstrates that during the period of Barnhart's suspension, certain shareholders suggested that Barnhart take an early retirement. Barnhart asserts that these suggestions and requests indicate that his age was the underlying factor in his expulsion and that the law firm's stated reasons of deteriorating work performance and non-cooperation were merely pretext.

This court has addressed situations involving suggestions of early retirement in a variety of circumstances. In *Danielson v. City of Lorain,* 938 F.2d 681 (6th Cir.1991), the plaintiff alleged that before she was terminated her supervisor told her that, because of her age, she should consider retirement. There was evidence, however, that plaintiff's work was substandard. The court stated:

> We assume for the purpose of this appeal that the fact finder would credit ... [plain-

tiff's] allegation that ... [her supervisor] said he thought she should consider retiring because of her age. Even though such a statement is strong evidence of an illegitimate motive, the record clearly establishes a poor working record that began before the alleged statement and which was documented by several complaining supervisors.

*Danielson,* 938 F.2d at 684–685.

■ The *Danielson* decision clearly defined this court's approach to cases involving requests for retirement. Statements requesting employees to retire because of their age suggest an illegitimate motive. *Id.* at 684. Presumption of an illegitimate motive, though, may be overcome by showing that the complaining employee exhibited a poor working record prior to the employer's request that he retire. *Id.* at 685. The *Danielson* court flatly refused to find that employers who ask inefficient or dilatory employees to retire violate the ADEA: "Workers who poorly perform their jobs," the court maintained, "will not be insulated from dismissal simply because they are members of the protected age group." *Id.* at 684.

This court also specifically addressed the issue of employer to employee requests for retirement in two recent cases. In *Grubb v. W.A. Foote Memorial Hosp., Inc.,* 741 F.2d 1486 (6th Cir.1984), *vacated on other grounds,* 759 F.2d 546 (6th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 289 (1985), the plaintiff presented evidence that his supervisor described him as "old and set in his ways," and had commented about plaintiff's health and encouraged him to retire. The Sixth Circuit found that the meaning of these remarks was ambiguous at best and did not support a finding that age was a motivating or determining factor. *Id.* at 1498.

Likewise, the plaintiff in *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 514 (6th Cir.1991), maintained that before his supervisor fired him, the supervisor encouraged plaintiff to take an early retirement. In denying plaintiff's claim for age discrimination, this court held that "[a]bsent testimony that ... [plaintiff's supervisor] took active

steps to push [plaintiff] toward retirement based on an *improper discriminatory motive*, no factual issue can be gleaned ... which might have led a reasonable jury to find in [plaintiff's] favor on the 'ADEA' claim." *Id.*

Similarly, in the instant case, the record clearly demonstrates that age was not the motivating factor in suggesting that Barnhart retire. Although none of the shareholders articulated the basis for his vote to suspend Barnhart since the vote was taken by secret ballot, neither the August 25, 1989 letter of suspension, nor the letter of termination make any reference to Barnhart's age. Also, none of the correspondence or communications between Barnhart and the Defendants between August 25, 1989, and the date of Barnhart's termination referenced Barnhart's age as the basis of his suspension or later termination. Thus, individual shareholders' suggestions that Barnhart retire are not alone sufficiently indicative of discrimination.

Further, that the Defendant firm was considering amending its mandatory retirement policy from age seventy to age sixty-five also fails to constitute sufficient evidence of pretext. Even assuming, *arguendo,* that the proposed reduction in the mandatory retirement age would, if passed, have violated Barnhart's ADEA rights, Barnhart still fails to establish any *causal* nexus between the firm's consideration of the reduction and the firm's later decision to terminate him. In fact, the evidence demonstrates that there was no such connection at all. Barnhart was sixty-one years of age at the time of his suspension, and subsequent firing. Had the shareholders either proposed or passed the age reduction amendment with the intent of effectuating his retirement, they would still have had to wait another four years before their plan would come to fruition.

Also, at the time the firm was considering the reduction, five of the firm's eleven shareholders were over fifty-two years of age. It belies common sense to suggest that these attorneys would hasten their own retirement in exchange for Barnhart's earlier mandatory retirement.

Where, as here, Plaintiff cannot establish a nexus between the allegedly age-based action and his later firing, no claim of discrimination will lie. *Hill v. Spiegel, Inc.,* 708 F.2d 233, 237 (6th Cir.1983); *Brownlow v. Edgecomb Metals Co.,* 867 F.2d 960, 965 (6th Cir.1989).

■ Finally, Barnhart's contention that pretext is demonstrated by Defendants' hiring of Andrew Storar (age thirty-seven) and John Slagle (age forty-three) approximately one month prior to Plaintiff's termination is misguided. *McDonnell Douglas* and *Burdine* indicate that proof of replacement by a person outside the protected class is merely a prerequisite to the establishment of a *prima facie* case of employment discrimination. Such proof does nothing to establish pretext. If it did, all employment discrimination plaintiffs who established a *prima facie* case would necessarily demonstrate pretext in the same showing. Employment discrimination defendants would then never have an opportunity to articulate legitimate non-discriminatory reasons for a plaintiff's dismissal, and they would always be liable upon a plaintiff's establishment of a *prima facie* case. Such was not the intent behind ADEA.

## V.

Thus, since Barnhart has failed sufficiently to demonstrate that Defendants' legitimate non-discriminatory reasons for discharge are pretext, the district court properly granted Defendants' motion for summary judgment on Barnhart's ADEA claim. We, therefore, AFFIRM.