**KRAMER CONSULTING, INC., Plaintiff,**

v.

**Kevin MCCARTHY, Defendant.**

**Kramer Consulting, Inc., Plaintiff,**

v.

**Kevin McCarthy, et al., Defendants.**

**Nos. 2:02CV115, 2:02CV116.**

United States District Court, S.D. Ohio, Eastern Division.

Sept. 26, 2003.

Rule of Civil Procedure 15(a) and deems the Complaint amended to omit their second claim for relief.

Theodore Richard Saker, Jr., Columbus, OH, for Plaintiff and Counter Defendant.

Thomas Robert McGrath, McGrath & Breitfeller, Columbus, OH, for Defendants and Counter Claimants.

## *ORDER AND OPINION*

MARBLEY, District Judge.

### I. Introduction

This matter is before the Court on Kramer Consulting, Inc.'s Motion for Summary Judgment in Case No. 2:02CV115, and Kevin McCarthy and Xcel Corporation's Motion for Summary Judgment in Case No. 2:02CV116. For the following reasons, Kramer Consulting, Inc.'s Motion for Summary Judgment in Case No. 2:02CV115 is **DENIED** and Kevin McCarthy's and Xcel Corporation's Motion for Summary Judgment in Case No. 2:02CV116 is **GRANTED** in part and **DE-NIED** in part.

### II. Facts and Procedural History

Kramer Consulting, Inc. ("Kramer") is a computer consulting firm based in Dublin, Ohio. It develops a software product called Auto–Code. In May 2000, Kramer entered a business relationship with Kevin McCarthy ("McCarthy") and McCarthy's company, Xcel Corporation ("Xcel"). McCarthy and Xcel specialized in market-

ing, and Kramer entered its relationship with McCarthy and Xcel in an effort to boost sales of its Auto–Code product.

On May 5, 2000, Kramer sold McCarthy 430 shares of Kramer for $107,500 pursuant to a stock purchase Agreement. McCarthy did not pay cash for these shares, but rather gave Kramer a Cognovit Promissory Note in the amount of $107,500. The parties also entered an Employment Agreement setting forth the terms of Kramer's employment of McCarthy.

As part of the transaction, McCarthy became a director and the chief financial officer of Kramer. McCarthy assumed the bookkeeping duties for Kramer, and other duties for marketing the Auto–Code product. The relationship between Kramer and McCarthy, however, quickly deteriorated. McCarthy's company Xcel began to bill Kramer for the services of Xcel employees, including a bookkeeper. Xcel charged Kramer thirty-five dollars an hour for the services of its employees. Although Kramer did not completely object to these charges, some officials at Kramer felt that the company could not afford to pay for such outside services. Nevertheless, McCarthy always paid Xcel's bill.

Although McCarthy saw to the expeditious payment of Xcel bills, other bills for utilities, insurance, payroll taxes, and other business expenses began to go unpaid. Sometime during 2001, Kramer and McCarthy separated. Although McCarthy retained his stock in Kramer, officials at Kramer informed McCarthy that they no longer wanted his services.

Between May 2000 and January 2001, McCarthy made four payments on his Cognovit Promissory Note in addition to a $3,000 initial payment. In July 2000, McCarthy paid $3,000, in October 2000, he paid $8,000, in October 2000, he made another payment of $4,000, and in January 2001, he paid $2,600. Since January 2001, McCarthy has made no payments on the note.

Kramer filed its first lawsuit in Common Pleas Court of Franklin County, Ohio, on December 14, 2001 (the "Cognovit Note Case"). Kramer's Complaint in the Cognovit Note Case claims that McCarthy is in default on the cognovit note and that Kramer is entitled to judgment for the balance due on the note. The Common Pleas Court entered judgment against McCarthy on December 20, 2001. McCarthy then removed the case to this Court, which granted his motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b) on September 6, 2002. This Court found that relief from judgment was appropriate because McCarthy had a valid defense to Kramer's argument that he was in default on the note because the note does not become due until June 1, 2004.

Kramer filed a second lawsuit in Common Pleas Court of Franklin County, Ohio, on December 14, 2001 (the "Fraud Case"). Kramer's Complaint in the Fraud Case seeks damages against McCarthy based on claims of fraud, conversion, embezzlement, and breach of fiduciary duty. McCarthy also removed the Fraud Case to this Court, and in his answer, stated a counterclaim that Kramer is required to repurchase his 430 shares of stock pursuant to the Employment Agreement between Kramer and McCarthy that requires Kramer to repurchase the stock if McCarthy's employment is ever terminated.

Kramer has filed a Motion for Summary Judgment in the Cognovit Note case asking the Court to grant judgment in its favor because McCarthy is in default on the note. McCarthy has filed a Motion for Summary Judgment in the Fraud Case seeking judgment in his favor on all of Kramer's claims and on his counterclaim.

## III. Standard of Review

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. Analysis

### A. McCarthy's Motion for Summary Judgment on Kramer's Claims in the Fraud Case

The Court first considers McCarthy's Motion for Summary Judgment on Kramer's Claims in the Fraud Case. McCarthy argues that he is entitled to summary judgment on Kramer's claims for fraud, conversion, embezzlement, and breach of fiduciary duty. The Court will consider each of these claims in turn.

### (1) Fraud

■ Kramer alleges that McCarthy engaged in fraud or fraudulent inducement in his relationship with Kramer. According to Kramer, McCarthy made certain promises he did not keep after Kramer entered the agreements with McCarthy. McCarthy seeks summary judgment on Kramer's fraud and fraudulent inducement claims, arguing that he did not make any misrepresentations to Kramer.

■ The elements of an actual fraud claim in Ohio are as follows:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm–Cleveland, Inc.,* 33 Ohio St.3d 54, 514 N.E.2d 709, 712 (1987). Similarly, a "claim of fraud in the inducement arises when a party is induced to enter an agreement through fraud or misrepresentation." *ABM Farms, Inc. v. Woods,* 81 Ohio St.3d 498, 692 N.E.2d 574, 578 (1998). The crux of either an actual fraud or fraudulent inducement claim, therefore, is a *misrepresentation of a material fact.*

In this case, there is no evidence that McCarthy ever made any factual misrepresentations to Kramer. There is no evidence, for example, that McCarthy misrepresented his skills or experience or the

capabilities of his company, Xcel.[1] Likewise, although there is evidence that Xcel was in debt when Kramer and McCarthy entered their business relationship, there is no evidence, and Kramer does not argue, that McCarthy made any misrepresentations about the financial condition of Xcel.

The Ohio Supreme Court has clarified that fraud and fraudulent inducement depend on factual misrepresentations. According to the court, fraudulent inducement "relates not to the nature or purport of the [contract], but to the facts inducing its execution." *Woods,* 692 N.E.2d at 578. The court went on to explain:

> A classic case of fraudulent inducement asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract. Examples include a party to a release misrepresenting the economic value of the released claim, or one party employing coercion or duress to cause the other party to sign an agreement.

*Id.* In this case, there is no evidence that McCarthy misrepresented facts or engaged in other wrongful conduct such as coercion.

Kramer makes several arguments to support its claim for fraud. Kramer argues that it "intended for McCarthy and Xcel to be responsible for sales and marketing expenses of [Kramer's] product and perform the accounting services for the Company." Kramer also contends that McCarthy recognized these responsibilities. This argument, however, does not demonstrate fraud. First, what Kramer intended is not relevant to a claim of fraud. Rather, to support a fraud claim, Kramer must present evidence that McCarthy made a material misrepresentation of fact. Second, McCarthy in fact did oversee the marketing and accounting for Kramer. Kramer's only objection is that McCarthy charged the company an hourly rate for the services of Xcel employees. There is no evidence that McCarthy ever represented that Xcel would provide free services to Kramer. Furthermore, the evidence suggests that although Kramer objected to the amount of fees it was paying to Xcel, it did not completely object to paying Xcel fees for accounting and other services. In an e-mail from Denise Kramer to McCarthy on August 22, 2000, Mrs. Kramer noted that she "could see some portion of [an Xcel employee's] salary being charged to [Kramer]" for accounting services, but she was concerned about whether the company could afford the fees that Xcel was charging. This statement indicates that Kramer was not under the false impression that Xcel employees would work for Kramer free of charge. If Kramer and McCarthy agreed that Xcel would provide certain services without a fee, McCarthy's failure to provide such services would not constitute a misrepresentation of fact, but rather a broken promise.

Kramer also argues that McCarthy committed fraud by failing to pay Kramer's bills on time, which was part of his job as chief financial officer. Again, McCarthy's failure to pay bills timely does not constitute a misrepresentation of fact. He did not, for example, represent that he had certain accounting skills that he lacked or

---

**1.** Most of Kramer's arguments regarding fraud relate to certain promises that McCarthy allegedly made that he did not keep. McCarthy's failure to keep certain promises might give rise to a claim for breach of contract, but failure to keep a promise does not give rise to a claim for fraud unless McCarthy made misrepresentations about material facts. Because Kramer does not state a claim for breach of contract, the Court need not consider whether McCarthy breached his Employment Agreement or any other agreements with Kramer.

that certain bills had been paid. Rather, he admitted that the bills had not been paid. Therefore, there can be no claim for fraud premised on McCarthy's alleged failure to pay Kramer's bills on time.

Kramer argues that McCarthy must have engaged in fraud because Xcel's financial condition improved dramatically after McCarthy took over Kramer's checkbook. Once again, this is not evidence of a material misrepresentation of fact, which is necessary to state a claim for fraud. There is no explanation in the record of why Xcel's financial condition improved dramatically shortly after McCarthy entered his relationship with Kramer. Kramer only claims that McCarthy paid Xcel $22,000 in fees. This charge does not explain why Xcel's equity changed from minus $154,964.66 in December 1999 to positive $34,926.11 in December 2000. The Court notes that Xcel's equity fluctuated greatly both before and after McCarthy entered his relationship with Kramer. Furthermore, even if Kramer could prove that McCarthy was somehow stealing money from it, this would not create a claim for fraud because it does not constitute evidence of a misrepresentation of a material fact.

Finally, during oral argument, counsel for Kramer pointed to two e-mail messages from McCarthy to Bill Kramer that allegedly contain material misrepresentations of fact. The first e-mail message, attached as Exhibit G to McCarthy's deposition, states that McCarthy "will be chipping in heavy on so to speak free labor." The message also details how long it takes McCarthy to travel from his home in Indiana to Columbus and states that McCarthy "lists everyone as sales only as a mine [sic] set." Finally, McCarthy asked Bill Kramer whether "[i]ncome you and Dave want to pull is that between you and me [sic]. Or is that between everyone who has stock." Rather than relying on

this message, Bill Kramer wrote to McCarthy in reply: "I'm not sure I understand this . . . . random musings or gibberish? <grin>." Although McCarthy indicated that he would be chipping in on free labor, he did not indicate that other Xcel employees would work free of charge. The argument that Kramer was relying on Xcel to provide free services is belied by the fact that Denise Kramer did not find the bills from Xcel completely out of line. In any event, Bill Kramer's response to McCarthy's e-mail message demonstrates that Kramer did not rely on any representations in this message. Rather, Bill Kramer did not even understand what McCarthy was trying to say.

The second e-mail message to which counsel referred the Court is marked as Exhibit H to McCarthy's deposition. This e-mail message is a follow-up message to McCarthy's first message, which Bill Kramer apparently did not understand. In the second message, McCarthy indicates that he has people lined up to serve as a sales force. The message does not state how that sales force would be compensated. In fact, McCarthy did provide a sales force; therefore, there is no evidence that he misrepresented a material fact when he stated that he had a sales force lined up.

Accordingly, the Court **GRANTS** McCarthy summary judgment on Kramer's fraud claims because Kramer fails to present any evidence that McCarthy ever misrepresented a material fact.

### (2) Conversion and Embezzlement

■ Kramer also claims that McCarthy converted or embezzled funds when he wrote checks from Kramer to Xcel. In its Memorandum Contra, Kramer does not address its embezzlement claim. The Court finds that Kramer did not intend to state a separate claim for embezzlement in the complaint, but only meant to state a

claim for conversion, which is a private tort. Therefore, the Court only considers whether McCarthy converted funds from Kramer.

The tort of conversion in Ohio "might arise from the exercise of a dominion over [another's property] in exclusion of the rights of the owner, or withholding [another's property] from his possession under a claim inconsistent with his rights." *Balt. & Ohio R.R. v. O'Donnell,* 49 Ohio St. 489, 32 N.E. 476, 478 (1892); *see also Joyce v. Gen. Motors Corp.,* 49 Ohio St.3d 93, 551 N.E.2d 172, 175 (1990). "The elements of a conversion claim are: 1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and 3) damages." *NPF IV, Inc. v. Transitional Health Servs.,* 922 F.Supp. 77, 81 (S.D.Ohio 1996). Although the owner of property usually need not demand return of the property for a conversion claim to arise, *see O'Donnell,* 32 N.E. at 478, there can be no claim for conversion where one lawfully acquires possession of the property of another unless the owner demands return of the property and the defendant refuses to return the property, *see Fidelity & Deposit Co. of Md. v. Farmers & Citizens Bank of Lancaster,* 72 Ohio App. 432, 52 N.E.2d 549, 550–51 (1943); *see also NPF IV,* 922 F.Supp. at 81.

In this case, McCarthy wrote checks to Xcel to pay for certain services that Xcel provided to Kramer. In his capacity as chief financial officer of Kramer, McCarthy had the authority to write checks for Kramer. There is no evidence that Xcel did not in fact perform the services that it billed to Kramer. Although Kramer argues that Xcel should not have charged for its services, there is no evidence that the charge of thirty-five dollars an hour was unreasonable or unjustified. Furthermore, as discussed above, although Kram-

er had not expected to be billed for these charges, it did not wholly object to the charges. Therefore, Kramer's claim for conversion fails the second requirement for a conversion claim. That is, McCarthy did not convert the funds in question by a wrongful act. Instead, as chief financial officer of Kramer, McCarthy had the authority to pay Xcel for the services it billed to Kramer.

Therefore, the Court **GRANTS** McCarthy summary judgment on Kramer's conversion and embezzlement claims.

### (3) Breach of Fiduciary Duty

Lastly, Kramer claims that McCarthy breached his fiduciary duty to Kramer as a director and as chief financial officer. McCarthy responds that he carried out all of his duties as a director and an officer of Kramer in good faith.

Ohio law requires directors of corporations to follow a standard of care described as follows:

> A director shall perform his duties as a director, including his duties as a member of any committee of the directors upon which he may serve, in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

Ohio Rev.Code Ann. § 1701.59(B) (West 2003). A director may only be found to have violated his duties by clear and convincing evidence. Ohio Rev.Code Ann. § 1701.59(C)(1). A director can only be held liable for damages if it is proven that his "action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation." Ohio Rev.Code Ann. § 1701.59(D).

In this case, Kramer claims that McCarthy violated his fiduciary duty as a director and an officer by failing to pay all the bills of Kramer. As chief financial officer, McCarthy was charged with keeping the books and paying bills. Although he paid several bills for over twenty thousand dollars to his own outside company, Xcel, he failed to pay other bills for insurance, utilities, payroll taxes, and other important business expenses. A reasonable jury could find that McCarthy's failure to pay these bills, while at the same time paying Xcel's bills, constituted a breach of his fiduciary duty because it was not in the best interest of the corporation. The corporation arguably would have been better served by maintaining its basic services such as insurance and utilities, rather than paying discretionary expenses to Xcel. A reasonable jury could assess damages against McCarthy because it could find that his actions were undertaken with a reckless disregard for the best interests of the corporation. Kramer has presented evidence that bills went unpaid while McCarthy was in charge of paying them.

In defense of his failure to pay these bills, McCarthy argues that the business judgment rule shields his actions. Under the business judgment rule, courts defer to the judgment of directors in making corporate decisions. *See Gries Sports Enters., Inc. v. Cleveland Browns Football Co.,* 26 Ohio St.3d 15, 496 N.E.2d 959, 963 (1986). The business judgment rule does not protect a director, however, where that director has an interest in the transaction at issue. *See id.,* 496 N.E.2d at 965; *see also United States v. Skeddle,* 940 F.Supp. 1146, 1152 & n. 5 (N.D.Ohio 1996). In this case, McCarthy had an interest in paying Xcel's bills while neglecting Kramer's other bills. Xcel was McCarthy's own company and he profited from its business. The business judgment rule, therefore, does not protect McCarthy in this case. Where the business judgment rule does not apply,

the Court must "scrutinize the [director's] decision as to its intrinsic fairness to the corporation." *Gries Sports Enters.,* 496 N.E.2d at 963. Under this standard, a reasonable jury could find that McCarthy breached his fiduciary duty to Kramer when he paid Xcel's bills but neglected the corporation's other debts.

Therefore, the Court **DENIES** Defendants' Motion for Summary Judgment with respect to Plaintiff's breach of fiduciary duty claim.

## B. Kramer's Motion for Summary Judgment in the Cognovit Note Case

■ When McCarthy began his relationship with Kramer, he agreed to purchase 430 shares of Kramer stock for $107,500.00. Rather than pay for the shares in cash, McCarthy delivered a Cognovit Promissory Note to Kramer in the amount of $107,500.00. That note states that it "shall be due and payable on June 1, 2004." It further states that "[a]ll or part of the principal sum and accrued interest may be paid at any time without penalty." Finally, the cognovit note addresses default stating only that "[u]pon default when due, this note shall, at the option of the holder hereof, bear interest thereafter at a rate of Ten (10%) percent per annum, and the entire principal hereof then remaining unpaid, together with all accrued interest, shall, at said holder's option, become immediately due and payable without any notice or demand." In a separate Agreement, not referenced in the cognovit note, McCarthy agreed to pay $107,500.00 in forty-eight equal monthly installments of $2,574.22. This Agreement provided no terms regarding default.

In the Cognovit Note Case, Kramer seeks summary judgment arguing that McCarthy has defaulted on the note by failing to make monthly installments on the note. McCarthy has not made any

payments on the note since early 2001. Kramer initially filed the Cognovit Note Case in the Common Pleas Court of Franklin County, Ohio. That Court entered judgment against McCarthy on December 20, 2001. McCarthy then removed the case to this Court, which granted his motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b) on September 6, 2002. The Court found that relief from judgment was appropriate because McCarthy had a valid defense to Kramer's argument that he was in default on the note because the note does not become due until June 1, 2004.

After reviewing both the Cognovit Promissory Note and the separate stock purchase Agreement between McCarthy and Kramer, the Court finds that McCarthy is not currently in default under the note. In the Cognovit Note Case, Kramer only claims that McCarthy is in default on the note; Kramer does not state a claim for breach of contract. Therefore, the Court only considers the terms of the note. According to the note, the balance does not become due and payable until June 1, 2004. The default provision of the note only addresses default after the note becomes due, and does not mention the possibility that the note could be in default before it becomes due.

Furthermore, the note does not reference the separate agreement between the parties that requires forty-eight monthly

payments. In any event, the separate Agreement does not provide any terms regarding default. The only default provision in either the note itself or the separate Agreement is in the note, and according to that provision, McCarthy cannot be in default until June 1, 2004. Even if the Court found that McCarthy was in default on the note for failure to make monthly payments, that would not mean that the entire balance is immediately due. There is no provision in either the note (which makes no mention of monthly payments) or the separate stock purchase Agreement that states that failure to make a monthly payment constitutes default or causes the remaining balance on the note to become immediately due and payable.

Accordingly, the Court **DENIES** Kramer's Motion for Summary Judgment in the Cognovit Note Case. A reasonable jury could conclude based on the plain language of the both the note and the separate Agreement that McCarthy is not currently in default on the note.[2]

## C. Defendants' Motion for Summary Judgment on McCarthy's Counterclaim in the Fraud Case

■ In the Employment Agreement between Kramer and McCarthy, the parties recognized that McCarthy had purchased shares in Kramer and agreed that Kramer would repurchase all of those shares "[i]n the event that either party terminates this Agreement for any reason." The Employ-

**2.** In addition to arguing that the note does not become due until June 1, 2004, McCarthy argues that he is not in default under the note because Kramer waived any right it had to monthly payments when it accepted McCarthy's sporadic payments on the note. From May 2000 through January 2001, McCarthy made four payments on the note in addition to an initial down payment. These payments ranged from $2,600 to $8,000, and they were made irregularly. McCarthy argues that even if he ever agreed to make monthly payments on the note, Kramer waived its right to

monthly payments when it accepted these irregular payments. Kramer responds by arguing that as the chief financial officer of Kramer, McCarthy should have made his note payments in a timely fashion. McCarthy was the one who permitted himself to make sporadic payments on the note. Because the Court finds that McCarthy is not currently in default on the note, the Court need not decide whether Kramer waived its right to monthly payments under the separate Agreement.

ment Agreement gives additional details about how the shares would be valued in the event that Kramer repurchased them.

In the Fraud Case, Defendants state a counterclaim that Kramer must repurchase McCarthy's stock in Kramer because his employment with the company has terminated. McCarthy seeks summary judgment on this counterclaim. Kramer's only defense to this counterclaim is that it was fraudulently induced to enter the agreement with McCarthy, and therefore, the agreement is invalid. Because the Court finds that Kramer was not fraudulently induced into entering its agreement with McCarthy, this argument fails. Furthermore, Kramer makes no specific allegation that its agreement to sell stock to McCarthy and its agreement to repurchase that stock should McCarthy's employment ever be terminated was fraudulently induced. In fact, McCarthy's acquisition of stock was in exchange for valid consideration because McCarthy gave Kramer a promissory note in the amount of the value of the stock.

Kramer apparently wants to hold McCarthy in default on the Cognovit Promissory Note, refuse to repurchase McCarthy's stock, and force McCarthy to surrender his stock to Kramer. In other words, Kramer argues that McCarthy should be forced to forfeit his stock in Kramer, *and* pay the balance due on the promissory note. Even if this Court held the contracts between McCarthy and Kramer to be invalid due to fraud, McCarthy would be required to surrender his stock, but he could not be required to pay Kramer the balance due on that stock. Such a result would confer a windfall on Kramer.

Because McCarthy's employment with Kramer has terminated, and Kramer has no additional defense to McCarthy's counterclaim, the Court **GRANTS** Defendants' Motion for Summary Judgment on McCar-

thy's counterclaim and **ORDERS** Kramer to repurchase McCarthy's stock according to section 10 of the Employment Agreement. The Court concludes that no reasonable jury could conclude that Kramer is not required to repurchase McCarthy's stock. The Court notes that section 10 of the Employment Agreement contains provisions about how the stock should be valued and states that Kramer is not required to pay the full value of the stock if McCarthy's employment is terminated less than thirty-five months after his employment commenced. The Court will not attempt to value McCarthy's stock, but rather the parties must employ an accountant according to the terms of section 10 of the Employment Agreement to properly value the stock for Kramer's repurchase.

Furthermore, this issue is interrelated with the Cognovit Note Case because Kramer will not be required to buy back McCarthy's stock in cash. McCarthy has only paid a small portion of the amount he owes on the stock he purchased. Therefore, Kramer is only required to pay McCarthy the positive difference, if any, in the value of McCarthy's stock according to section 10 of the Employment Agreement and the outstanding balance on the Cognovit Promissory Note. In fact, because McCarthy has failed to make payments on the cognovit note for over two years, McCarthy may owe more on the note (with interest) than his stock is currently worth under section 10 of the Employment Agreement. If this is the case, McCarthy must surrender his stock to Kramer for a credit against the note, but he will continue to owe Kramer a balance on the note. Although the Court finds that McCarthy is not currently in default on the note, if he fails to pay on the note, he may be in default as of June 1, 2004.

## V. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment in the

Cognovit Note Case (2:02CV115) is **DE-NIED,** Defendants' Motion for Summary Judgment on Plaintiff's Claims in the Fraud Case (2:02CV116) is **GRANTED** with respect to Plaintiff's fraud, conversion, and embezzlement claims, but **DE-NIED** with respect to Plaintiff's breach of fiduciary duty claim, and Defendants' Motion for Summary Judgment on McCarthy's Counterclaim in the Fraud Case (2:02CV116) is **GRANTED.** Furthermore, Kramer's Motion to Strike Defendant's Reply Memorandum in the Fraud Case (2:02CV116) is **DENIED.**[3]

**IT IS SO ORDERED.**

---

**3.** Kramer moves to strike McCarthy's Reply Memorandum in the Fraud Case because it was filed more than eleven days after Kramer's Memorandum Contra. Kramer, however, appears not to be innocent of making similarly late filings. The Magistrate Judge ordered that Kramer was to file its Memorandum Contra in the Fraud Case by August 8, 2003, but Kramer did not file its Memorandum Contra until August 13, 2003. Rather than striking either party's filings, the Court denies Plaintiff's Motion to Strike Defendant's Reply Memorandum.