Georgiana A. WIXSON, Edith M. Mutimura, Kenneth Wixson and Charles Mutimura, Plaintiffs,

v.

DOWAGIAC NURSING HOME, Borgess Health Care Alliance, Sandra Gardner and United Food & Commercial Workers International Union, Local 951, jointly and severally in their individual and in their official capacities, and other unnamed co-conspirators, Defendants.

No. 1:93–CV–736.

United States District Court,
W.D. Michigan,
Southern Division.

Nov. 4, 1994.

**1050**

Robert A. Yingst, Holly F. Underwood, Boothby & Yingst, Berrien Springs, MI, for plaintiffs.

Craig H. Lubben, Barry R. Smith, Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for defendants Dowagiac Nursing, Borgess Health Care and Sandra Gardner.

Ronald L. Rahal, Kalniz, Iorio & Feldstein, Toledo, OH, for defendant Local 951.

## MEMORANDUM OPINION AND ORDER

McKEAGUE, District Judge.

This case presents an action claiming employment discrimination in violation of Title VII, racial discrimination and disparate treatment in violation of 42 U.S.C. § 1981, a conspiracy to commit these two violations, and a pendent state law claim under the Michigan Elliott–Larsen Civil Rights Act (MELCRA).[1] Now before the Court are defendants' motions for summary judgment as to all plaintiffs and all claims.[2]

### I. FACTUAL BACKGROUND

Plaintiffs Georgiana Wixson and Edith Mutimura were employed as nurses aides by defendant Dowagiac Nursing Home (DNH), a subsidiary of defendant Borgess Health Care Alliance. Defendant Sandra Gardner was formerly the assistant director of nursing at DNH; she became director of nursing in February 1993.[3] Plaintiffs' employment was subject to the collective bargaining agreement negotiated by defendant United Food and Commercial Workers International Union, Local 951 (Union).

Plaintiffs' pleadings are replete with allegations of wide-spread discrimination against African nationals employed by DNH, of which group plaintiff Mutimura is a member. Plaintiff Wixson alleges she was discriminated against because of her overt support of the African employees. Both plaintiffs re-

---

**1.** The complaint also states derivative loss of consortium claims on behalf of the plaintiff-employees' husbands. However, throughout this opinion, the word "plaintiffs" refers only to the plaintiff-employees, Georgiana Wixson and Edith Mutimura.

**2.** Plaintiffs' claims against the union are factually linked to the claims against the other defendants. The unsupported assumption is that the union's alleged discrimination was involved in the decision to terminate plaintiffs' employment. Without expressly deciding the existence of this al-

leged union involvement, the Court assumes this connection for purposes of this opinion because, framed thusly, the threshold question is whether the employer unlawfully discriminated against plaintiffs. In this context, then, the relevant analysis in section IV below applies with equal force to the employer and the union.

**3.** Throughout this opinion, reference to DNH is to be construed as a reference to DNH, Borgess Health Care Alliance, and Sandra Gardner, unless specifically stated otherwise.

ceived numerous employee discipline reports for various infractions.

## A. Plaintiff Georgiana Wixson

Plaintiff was employed by DNH as a nurses aide for approximately ten years. Plaintiff claims that her termination in October 1992 "was a culmination of a persistent pattern of discrimination and harassment in the work place." (Plaintiff Wixson's response brief, p. 2). The alleged discrimination was aimed at the African employees of DNH and plaintiff alleges she was discriminated against because of her support for these employees.

Plaintiff received her first employee discipline report on March 21, 1991, after calling in sick for the fourth time during a contract year. This was in accord with the policy set forth in the DNH employee handbook. Plaintiff explained to the registered nurse who issued the discipline report that she had previously received permission from then director of nursing, Janet Sigh, to take the time off. The registered nurse confirmed that plaintiff had been given permission and plaintiff considered that incident resolved.

Plaintiff received her next employee discipline report on October 26, 1991, for improperly interfering with a supervisor who was disciplining another nurses aide. Plaintiff admits to the actions detailed in the discipline report. Plaintiff declined to file a union grievance regarding this discipline report. On December 13, 1991, plaintiff received an employee discipline report from then assistant director of nursing, Maelene Salmons, after Salmons found a soiled sheet on one of plaintiff's patient's bed. Plaintiff disagreed with the discipline report but did not file a grievance.

On March 18, 1992, at her request, plaintiff and her husband and daughter met with Ruth Olech, the senior administrator for Borgess Health Care Alliance, who was the direct supervisor of the DNH administrator. At this meeting, plaintiff expressed her concerns regarding the alleged discrimination of the African employees at DNH and, according to plaintiff, Olech told her "she would take care of things." Plaintiff testified that Olech called her at home two days later to ask her how things were going. Olech subsequently sent a letter to plaintiff informing her that she had met with Frank Blaise, the administrator of DNH, Todd Regis, a business representative of the union, and a human resources representative from Borgess Health Alliance. The letter also informed plaintiff that Olech had met with eleven of the African employees, that plans were being made to conduct meetings between the African employees and the nurses, and expressed Olech's confidence that in the future these employees would "voice their concerns directly to the facility, thus making your concerns about them less traumatizing to you." Plaintiff admits that Olech later met a second time with the African employees, along with Todd Regis, Frank Blaise, and the supervising nurses.

On April 8, 1992, plaintiff received two employee discipline reports for two different instances of insubordination to Tracy Ackerman, her supervisor. Consequently, plaintiff was suspended for one week without pay. Plaintiff admits that, at her request, the union filed a grievance regarding these two discipline reports. The second step hearing of the grievance process was held on April 27, 1992, but the grievance was not resolved at that time. However, the grievance was ultimately resolved in plaintiff's favor; she received back pay for the time on suspension and the two discipline reports for insubordination were removed from her personnel file.

Plaintiff received her next employee discipline report on June 15, 1992, for failure to properly change the soiled linens on a patient's bed. Plaintiff admits the discipline report was issued as a result of the patient's complaint. Plaintiff did not file a grievance regarding this discipline report.

On July 23, 1992, at plaintiff's request, the union filed a grievance alleging that the 3:00 p.m. to 11:00 p.m. shift was being singled out by being required to fill out assessment sheets, which were simply checklists of the duties to be performed in caring for patients. The grievance also alleged that the 3:00 p.m. to 11:00 p.m. shift was being discriminated against by having a "charge tech" as supervisor. Plaintiff later admitted at her deposi-

tion that all nurses aides on the 3:00 p.m. to 11:00 p.m. shift, regardless of national origin, were required to fill out the assessment forms. Plaintiff, however, refused to fill out and sign such forms, but she was never disciplined for such refusal. Plaintiff also admitted she had no actual knowledge that the other two shifts did not in fact also have supervisors, or that the alleged supervisor on her shift was officially designated as such. The grievance was ultimately withdrawn by the union as a result of plaintiff's refusal to cooperate.

The specific incident that lead to DNH's decision to terminate plaintiff's employment involved her disclosure to her husband of confidential patient information in violation of established DNH policy. The patient, Mrs. Rose Hickman, told plaintiff that a man had come into her room from off the street and touched her private parts. Plaintiff testified that Mrs. Hickman told her that she had told Tracy Ackerman about this incident and that Ackerman had told her not to say anything, that he would take care of it. Plaintiff related this incident to her husband and, more than a month later, they personally went to see Mrs. Hickman's son, Todd, and told him that his mother had told plaintiff that she had been sexually assaulted at the nursing home.

Plaintiff acknowledges that normal procedure would have been to report this alleged incident to supervisory personnel at DNH. However, plaintiff claims that in this instance "going to the administration was futile." The evidence in the record, however, shows that this was clearly not the case. In fact, Tracy Ackerman phoned Todd Hickman the same day Mrs. Hickman told him about the incident and reassured Todd that his mother was fine. The next day a registered nurse from DNH spoke with Todd Hickman. Further, Todd Hickman has stated that when they came to see him either plaintiff or her husband implied that DNH was trying to cover up the incident but that he was already aware of what had happened and had discussed it with administration officials at DNH.

Immediately upon learning of plaintiff's breach of patient confidentiality, DNH terminated her employment.

## B. Plaintiff Edith Mutimura

Plaintiff worked at DNH as a nurses aide on the 3:00 p.m. to 11:00 p.m. shift for slightly more than two years. During that brief time, however, plaintiff received 15 employee discipline reports. Six of those reports were for tardiness, which plaintiff attributed to "problems with transportation." Plaintiff admits being told at one point that she stood the risk of being suspended without pay because of her continual tardiness. One of these discipline reports states that plaintiff had been late 22 times and that she would be suspended without pay for one day.[4] Plaintiff signed this discipline report without noting any disagreement.

The remaining discipline reports were for various infractions of DNH employee rules: leaving the building for supper break without clocking out; extending her break beyond the allotted amount of time; complaints from other aides that plaintiff was not doing her fair share of the work; complaints from patients that plaintiff refused to assist them; leaving an infirm patient unattended on the toilet; and leaving a patient in bed with the side rail down, among other things.

At one point, plaintiff received a discipline report after a patient complained that plaintiff had been hitting her on the back and refused to stop when asked to do so. Sandie Gardner, then acting director of nursing, and plaintiff's union representative, Wanda Wares, discussed this complaint with plaintiff. Plaintiff stated that she had only been patting the patient's back and, after investigating the matter, Gardner concluded that disciplining plaintiff on the basis of this complaint was not appropriate. However, Gardner informed plaintiff that it was DNH policy that the complaint stay in her personnel file and that one more patient complaint would result in termination.

As previously mentioned, plaintiff received an employee discipline report for leaving a patient alone in bed with the side rail down.

---

**4.** Subsequent discipline reports noted totals of 30, then 36, incidents of tardiness.

Plaintiff admits that this incident occurred and acknowledges that it was a violation of DNH policy, but objected to the discipline report because she claims the policy was frequently violated by all employees. Plaintiff received a three-day suspension without pay and was told that one more such incident would result in her termination.

Plaintiff filed a grievance regarding this discipline report which, after the step 1 hearing, resulted in resolution of the grievance in plaintiff's favor. DNH agreed to compensate plaintiff with back pay for the three-day suspension and plaintiff agreed to complete a three-hour safety training course for which she would not be paid. Subsequent negotiation resulted in removal from the discipline report of the warning that one more incident would result in plaintiff's termination.

On March 12, 1993, plaintiff received a discipline report for reading non-work-related material during working hours. As a result of this discipline report, plaintiff was suspended indefinitely. Again, plaintiff admits her understanding that her actions were in violation of the rules but claims that other employees were not disciplined for the same infraction. However, the deposition testimony of Sandie Gardner, unrefuted by plaintiff, is that other employees, including white nurses aides, were also disciplined for reading non-work related material during working hours.

Plaintiff's union steward filed a grievance on plaintiff's behalf regarding this disciplinary action. No resolution was reached at the step 1 grievance hearing and plaintiff's suspension continued. During the step 2 grievance hearing, a settlement proposal was worked out between plaintiff's union representatives and representatives of DNH. The terms of the proposal were as follows: plaintiff would return to work on April 12, 1993, but would be transferred to the 7:00 a.m. to 3:30 p.m. shift; plaintiff would not receive any back pay, but neither would she suffer any loss of seniority; and finally, a notice was to be placed in plaintiff's personnel file stating that she would "be expected to perform at a satisfactory level according to policies and standards of Dowagiac Nursing Home" and that any subsequent violation of company policy would result in plaintiff's discharge. After reading the proposed settlement, plaintiff stated she would have a problem with her new shift assignment because her husband worked during the day and she had no one to care for her children. The director of nursing explained to plaintiff that the switch was to allow them to monitor her performance on the job.

Laura Parrish, plaintiff's union representative, offered to help plaintiff find a babysitter. Plaintiff was told she could pick the date for her return to work so that she would have adequate time to find a babysitter. Subsequently, plaintiff signed the proposed settlement agreement which, directly above the signature line, contained the following statement:

A Local 951 representative has fully explained all of the alternatives to me, including potential arbitration and I have willingly and freely accepted the above specified settlement. I further agree to waive any further action against my employer as it relates to the above listed matter. I hereby state that Local 951 has fully and fairly represented me in this matter to the best of my knowledge and I have knowingly waived any arbitration or further proceeding of such claims and/or grievances.

(Defendant DNH's brief in support of the motion for summary judgment as to plaintiff Mutimura, exh. H). Plaintiff testified at her deposition that she understood that the terms of the agreement required her to report to work for the 7:00 a.m. to 3:30 p.m. shift on April 12, 1993. She also understood that any further violation of company policy would result in discharge. Plaintiff's deposition testimony also reveals that subsequent to signing the settlement agreement she only contacted two people in an attempt to obtain a babysitter, neither of whom was able to help her. And neither did plaintiff avail herself of the assistance offered by her union representative or the representatives of DNH.

Plaintiff did not show up for work on April 12, 1993. Rather, plaintiff requested that she be allowed to take two weeks of vacation. The request was denied by director of nursing Sandie Gardner. Gardner testified that

she asked plaintiff when she would be able to return to work and plaintiff answered "maybe two weeks, maybe" because she still did not have a babysitter. Gardner offered to give plaintiff a list of licensed babysitters but was informed that plaintiff's husband would only allow an African to babysit for their children.

On April 14, 1993, Gardner sent plaintiff a letter confirming their telephone conversation of the previous day, during which plaintiff had been informed that if she did not return to work on April 14 she "would be terminated for insubordination and deliberately refusing a work assignment." The letter concluded by informing plaintiff that "as of today, April 14, 1993, you are hereby terminated from your employment at Dowagiac Nursing Home."

## C. Procedural History

EEOC issued notices of right to sue to both plaintiffs on June 18, 1993. Plaintiffs filed their original complaint on September 14, 1993. On April 11, 1994, Magistrate Judge Joseph G. Scoville entered an order granting plaintiffs' motion for leave to file a first amended complaint in order to assert additional factual allegations, to add plaintiffs' husbands as parties, and to assert loss of consortium claims on their behalf. The order denied leave to add claims on behalf of five additional proposed plaintiffs, all of whom are (or were) African employees at DNH.

The first amended complaint was filed on April 15, 1994, and defendants timely filed their answers. Pursuant to the case management order, the discovery period closed on July 11, 1994.

A hearing on defendants' motions for summary judgment was held on October 5, 1994, at the conclusion of which the motions were taken under advisement.

## II. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original).

■ The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, the moving party is not required to expressly negate the opponent's claim. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The movant satisfies its initial burden merely "by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

■ Once the movant makes a sufficient showing of an absence of evidence to support the non-moving party's case, the non-moving party then assumes the burden of coming forward with evidence demonstrating a genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 324–25, 106 S.Ct. at 2553–54. The non-moving party may not rest on the mere allegations contained in the pleadings, but, rather, must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. The non-moving party "cannot rely on

the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1389 (6th Cir.1993).

■ "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. And an issue of material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356.

■ This Court has at least some discretion in evaluating the non-moving party's evidence and in determining whether that party's claim is plausible. *Barnhart,* 12 F.3d at 1389. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. at 2553.

### III. APPLICABLE LAW

■ Plaintiffs have not adduced any direct evidence of racial discrimination or unlawful retaliation. In order to proceed, therefore, they must prove the elements of a prima facie case, which creates a rebuttable presumption of unlawful discrimination, by satisfying the factors of the analytical framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, n. 13, 93 S.Ct. 1817, 1824, n. 13, 36 L.Ed.2d 668 (1973). The precise formulation of these elements varies somewhat from case to case, depending on the specific employer action alleged to have been discriminatory. See *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13. However, all such formulations derive from *McDonnell Douglas* and its progeny.

■ The elements of a prima facie case of retaliation are:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his or her civil rights were known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Christopher v. Stouder Memorial Hosp.,* 936 F.2d 870, 877 (6th Cir.), *cert. denied* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991). To establish a prima facie case of discrimination, plaintiff must show:

that (1) she was a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by a person outside the class.

*Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992). "[A] plaintiff can also make out a prima facie case by showing, in addition to the first three elements, that a comparable non-protected person was treated better." To establish this alternative element, "the plaintiff must produce evidence which at a minimum establishes (1) that [s]he was a member of a protected class and (2) that for the same or similar conduct [s]he was treated differently than similarly-situated non-minority employees." *Id.* at 582–83.

■ Plaintiff must carry the initial burden of establishing a prima facie case by a preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). This burden "is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. As a general matter, it "is a burden easily met." *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). However, failure to prove any one of the elements by a preponderance of the evidence mandates dismissal of plaintiff's suit. *Morvay v. Maghielse Tool & Die Co.,* 708 F.2d 229, 233 (6th

Cir.), *cert. denied,* 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983).

If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason" for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. It is only the burden of production, however, that shifts to the defendant. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Galbraith v. Northern Telecom, Inc.,* 944 F.2d 275, 282–83 (6th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1497, 117 L.Ed.2d 637 (1992). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

Once the defendant succeeds in carrying its burden of production, the ultimate burden then shifts to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. "Indeed, the inference of discrimination created by the prima facie case is dispelled once the employer's reason is stated, until and unless the latter is shown to be a pretext." *Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1067–68 (6th Cir.1990). At this point, then, it is not enough to merely disbelieve the reasons offered by the employer. Rather, the plaintiff must affirmatively prove that these reasons are "in fact a coverup for a racially [or otherwise unlawful] discriminatory decision." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2753 (quoting *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1826).

## IV. ANALYSIS

The Court first deals with precisely which claims in plaintiffs' first amended complaint are properly before the Court for decision on their merits.

In their response briefs to the union's motions for summary judgment, both plaintiffs state that they withdraw their Title VII claims against the union. In recognition of the possibility that this decision will be appealed, however, the Court sets forth the legal basis for dismissal of these claims.

A person claiming to be aggrieved by a violation of Title VII may not maintain a suit for redress in federal district court until he has first unsuccessfully pursued certain avenues of potential administrative relief.

*Love v. Pullman Co.,* 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679 (1972). Although failure to exhaust administrative remedies is not a jurisdictional bar, such exhaustion is a condition precedent to commencement of an action in federal district court. *Brown v. General Services Adm.,* 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976). In its answer to plaintiffs' first amended complaint, the union raises as an affirmative defense plaintiffs' failure to exhaust their administrative remedies. Plaintiffs do not contend that they attempted to pursue any administrative remedies with the Equal Employment Opportunity Commission (EEOC) or a state agency relative to their claims against the union, and the record contains no evidence that they did so. The Sixth Circuit has held that such failure should be treated " 'like a statute of limitations' that is subject to waiver, estoppel and equitable tolling." *Boddy v. Dean,* 821 F.2d 346, 350 (6th Cir.1987) (quoting *Zipes v. Trans World Airlines,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982)). Plaintiffs make no attempt whatsoever to establish grounds for a waiver or estoppel and, in the Court's opinion, the circumstances do not justify equitable relief. "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984). The Court notes that plaintiffs have been represented by counsel throughout these proceedings. Further, "requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County,* 466 U.S. at 152, 104 S.Ct. at 1726. Accordingly, plaintiffs' Title VII claims against the union are

dismissed for failure to state a claim upon which relief can be granted.

Plaintiffs' claims under 42 U.S.C. § 1981 are similarly dismissed. The Sixth Circuit, applying *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), has squarely held "that claims of discriminatory discharge are no longer cognizable under § 1981 because discharge does not involve contract formation." *Harvis v. Roadway Express, Inc.*, 973 F.2d 490, 493 (6th Cir.1992), aff'd sub nominee *Landgraf v. U.S.I. Film Products*, — U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Plaintiff Mutimura's § 1981 claim is a straightforward discrimination claim and is not cognizable under § 1981. Insofar as plaintiff Wixson states a retaliation claim, she does so based on her allegation that supervisory personnel at DNH retaliated against her for speaking out on behalf of the African Nationals. She does not allege retaliation for attempting to enforce rights guaranteed to her by a contract. Therefore, her § 1981 claim must also be dismissed. See *Harvis*, 973 F.2d at 494, 496.

Also properly before the Court are plaintiffs' claims under 42 U.S.C. §§ 1985 and 1986, their pendent state law claims under MELCRA (pursuant to 28 U.S.C. § 1367), and plaintiffs' husbands' derivative claims for loss of consortium. The Court now addresses each remaining claim in its turn.

At the outset, the Court notes that "[t]he *McDonnell Douglas/Burdine* formula is the evidentiary framework applicable not only to claims brought under Title VII, but also to ... claims under 42 U.S.C. § 1981," *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir.1992), and to claims under MELCRA. See *Pitts v. Michael Miller Car Rental*, 942 F.2d 1067, 1070 (6th Cir.1991).

### A. Plaintiff Georgiana Wixson

#### 1. Prima Facie Case

DNH concedes that plaintiff has established the first three elements of her prima facie case, but denies that plaintiff has dem-

onstrated a genuine issue as to any causal connection between her support for the African employees and the decision to terminate her employment. This Court must agree.

Even when all reasonable inferences are drawn in plaintiff's favor, plaintiff's mere assertion of this causal connection is implausible. The evidence shows that plaintiff's overtures to DNH supervisory personnel and union representatives on behalf of the African employees resulted in several meetings of all concerned. And, far from retaliatory animus, Ruth Olech's letter to plaintiff demonstrates concern for plaintiff's psychological stress over the alleged discrimination against the Africans. Also, approximately seven months passed between plaintiff's advocacy on behalf of the African employees and the wholly separate incident resulting in her termination. This lapse of time further vitiates plaintiff's attempt to establish a causal connection. And finally, plaintiff's failure to dispute (indeed, her unqualified admission of) the facts relevant to the incident resulting in her termination leads the Court to conclude that plaintiff has not established a genuine issue (or any issue at all) as to this element of her prima facie case. Therefore, plaintiff's Title VII claim and, along with it, her MELCRA claims, must fall.[5]

The Court now turns, albeit briefly, to consideration of the remaining prongs of the *McDonnell Douglas* framework.

#### 2. Legitimate, Nondiscriminatory Reason for Termination

Even assuming that plaintiff has established a prima facie case, it is clear that defendant has set forth a legitimate, nondiscriminatory reason for termination of the plaintiff. DNH points to plaintiff's violation of its established policy by revealing confidential patient information to her husband. This policy is clearly job related and plaintiff concedes her knowledge of the policy.

> An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employ-

---

5. The Court also notes that, notwithstanding the previous dismissal of it, plaintiff's § 1981 claim would also fall with the Title VII claim.

er, or willfully interferes with the attainment of the employer's goals. *Holden v. Owens–Illinois, Inc.,* 793 F.2d 745, 753 (6th Cir.), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986). In the Court's opinion, DNH has stated a legitimate, nondiscriminatory reason for termination of plaintiff's employment, and the issue becomes whether such reason was a pretext for discrimination.

### 3. Pretext

■ In the Court's opinion, plaintiff makes no showing whatsoever that DNH's proffered reason for her termination was pretextual. She merely restates the allegations of wide spread discrimination and attempts to defend her violation of DNH policy by alleging that reporting the incident to her supervisors, which would have been the proper procedure, would have been futile.[6]

### 4. Conclusion

The Court concludes that the record taken as a whole could not lead a rational trier of fact to find for plaintiff, and that DNH is entitled to judgment as a matter of law as to plaintiff's Title VII and MELCRA claims.[7] Furthermore, because plaintiff's claims under §§ 1985 and 1986 are dependent upon a substantive violation, these claims too must fail. See *Michigan Protection & Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 348 (6th Cir.1994). Finally, plaintiff's husband's derivative loss of consortium claim also fails for want of an underlying basis.

## B. Plaintiff Edith Mutimura
### 1. Prima Facie Case

■ DNH concedes that plaintiff can establish all elements of her prima facie case except for the third element, plaintiff's qualifications for the position. DNH argues that plaintiff was not qualified because "[s]he was repeatedly disciplined for performance prob-

lems and then refused to work under terms she had agreed to." However, the Court notes that the settlement agreement expressly allowed plaintiff to return to her job. More significantly, plaintiff was not fired because she was repeatedly disciplined, and DNH's reliance on the fact that plaintiff refused to abide by the terms of the settlement agreement begs the ultimate question at issue here.

The Court concludes that, for purposes of establishing her prima facie case, plaintiff was qualified for the position from which she was terminated.

### 2. Legitimate, Nondiscriminatory Reason for Termination

■ DNH points to plaintiff's refusal to abide by the terms of the settlement agreement and return to work on the agreed upon date, or even, for that matter, on any other date of plaintiff's own choosing, as the reason for its termination of the plaintiff. Plaintiff does not dispute her refusal to return to work under these terms, nor does she dispute that her refusal constitutes sufficient grounds for termination, as she was informed by the letter from the acting director of nursing. The Court concludes, therefore, that DNH has met its burden by articulating a legitimate, nondiscriminatory reason for its decision.

### 3. Pretext

■ Plaintiff does not carry her burden of proving by a preponderance of the evidence that the reasons proffered by DNH were not the true reasons for its decision. Plaintiff merely restates her previous allegations and concludes that DNH "was making every effort to get rid of [her]." The record does not support this conclusion. Plaintiff had a problematic tenure at DNH, to say the least. However, she was not terminated until she steadfastly refused to abide by the terms of a negotiated settlement agreement.

---

6. In fact, her defense of her actions in revealing confidential patient information arguably exposes her to criminal liability. She accused DNH of covering up an alleged criminal act, which, as the evidence shows, is patently untrue. Making false criminal accusations is itself a crime.

7. As previously noted, DNH would also be entitled to summary judgment as to the § 1981 claim if it were properly before the Court. See *supra* n. 5.

Plaintiff focuses on the facts that she was switched to a different shift and that she had some problems obtaining a babysitter. The record indicates that plaintiff was informed that the reason for the change in shift was to allow the employer to more closely monitor her performance, which, in light of her disciplinary history, seems clearly justified. Plaintiff does not address the reason for this change in shift. Neither does plaintiff acknowledge the attempts of DNH supervisory personnel and union representatives to help her obtain a babysitter, or the offer by Sandie Gardner to allow plaintiff to choose the date for her return to work. There is no basis upon which a jury could reasonably conclude that she was coerced into signing the settlement agreement or that the defendant knew she would not be able to return to work as agreed. In short, there is simply no evidence that the defendants' proffered reason for her termination was pretextual.

### 4. Conclusion

No reasonable trier of fact could find that plaintiff carried her ultimate burden of proving that DNH intentionally and unlawfully discriminated against her in terminating her employment. Therefore, DNH is entitled to judgment as a matter of law as to plaintiff's Title VII and MELCRA claims. DNH is also entitled to summary judgment on plaintiff's other claims, and her husband's derivative claim, for the reasons set forth above in section IV.A.4.

An order consistent with this opinion shall issue forthwith.

### JUDGMENT ORDER

In accordance with the written opinion of the Court of even date,

**IT IS HEREBY ORDERED** that defendants' motions for summary judgment are **GRANTED.**

**IT IS FURTHER ORDERED** that defendants are **AWARDED JUDGMENT** in their favor with respect to all claims in plaintiffs' first amended complaint.