**BREWERY DISTRICT SOCIETY, et al., Plaintiffs,**

v.

**FEDERAL HIGHWAY ADMINISTRATION, Defendant.**

**No. 98 CV 00075.**

United States District Court, S.D. Ohio, Eastern Division.

March 29, 2002.

Clifford O. Arnebeck, Jr., Columbus, OH, for plaintiffs.

Deborah F. Sanders, James C. Wilson, U.S. Attorney's Office, Columbus, OH, for defendants.

Frederick Carter Schoch, Ohio Atty. General, Columbus, OH, for movant.

## OPINION AND ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT

MARBLEY, District Judge.

This matter comes before the Court on the Motion for Summary Judgment of Plaintiffs Brewery District Society, Dennison Place Association and Malcolm Cochran and the Motion for Summary Judgment of Defendant Federal Highway Administration ("FHWA").[1] This case

1. Defendant United States Environmental Protection Agency was dismissed from this

began as an attempt by Plaintiffs to save from demolition the last five remaining buildings of the old Ohio State Penitentiary ("Ohio Pen"). Those buildings have since been demolished. Remaining at issue is the propriety of the City of Columbus's extension of Nationwide Boulevard through the twenty-one acre Ohio Pen site and its widening of Neil Avenue along the site, and to what extent Defendant is obligated by federal statutes designed to protect historic properties to evaluate and mitigate the adverse impact of this construction on the Ohio Pen site. Defendant currently seeks a ruling that it has done all it need do; Plaintiffs seek an order commanding Defendant to evaluate and mitigate the adverse impact on the Ohio Pen site of the extension of Nationwide Boulevard and the widening of Neil Avenue. For the reasons that follow, the Court hereby **DENIES** Plaintiffs' Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment.

## I. INTRODUCTION

This case is complicated, both factually and legally. Since it seems to the Court that the facts giving rise to this lawsuit would be easier to follow with some background, the Court will attempt to outline the parties' respective legal arguments here, before a recitation of the relevant facts.

### a. Plaintiffs' Position

Since the Spring/Sandusky Interchange Project ("SSI Project") was—and is—a large-scale federal highway project, it is a "major Federal action". As such, its implementation is subject to all relevant federal historical protection statutes. The segment B–4, which would have connected Neil Avenue to Nationwide Boulevard, be-

case on February 19, 1998.

came a part of the SSI Project in 1984. In 1997, argues Plaintiff, the City of Columbus ("City") decided that it would rather have Nationwide Arena than the then-contemplated B–4, and withdrew its plans to construct B–4 and returned, with interest, the federal monies that it had spent planning the segment and acquiring the land necessary for its construction. Because the rest of the SSI Project was proceeding, though, the City still needed the additional capacity that B–4 would have provided, and so needed to build an alternative connector.

If the City had asked for federal funds for this connector, or even not paid back the monies it had already spent on B–4, the FHWA would have had to perform a reevaluation of the B–4 Finding of No Significant Impact ("FONSI") and/or consider the impact of this alternative connector before granting its approval—as it did on January 29, 1998—of the reevaluation of the Spring/Sandusky Interchange Environmental Impact Statement. Instead, the City and the Ohio Department of Transportation ("ODOT") decided, in an attempt to avoid the strictures of the federal historical protection statutes, to use only City funds to build a road connecting Dublin Avenue to Nationwide Boulevard (through the middle of the Ohio Pen site) and widen Neil Avenue. The FHWA "assisted" the City in this project by not threatening the withdrawal of federal funds from the rest of the SSI Project to keep the City from demolishing the Ohio Pen site until all relevant federal impact and mitigation analyses had been performed in evaluating the City's plan to build an alternative to B–4. Thus, because the City could not have avoided the federal statutes by "de-federalizing" and building B–4, were B–4 contemplated such that *it* would have adversely impacted the Ohio

Pen site, the FHWA should not be allowed to "assist" the City in making an end-run around federal law by "withdrawing" from one small part of the large-scale SSI Project in order to build an alternative to B–4 segment which does adversely impact the Ohio Pen site.

Defendant's argument is somewhat simpler. Defendant argues that the B–4 project was at all times separate and independent from the SSI Project. When the City canceled its application for B–4 funding and repaid the federal funds it had been advanced on the B–4 project, that project was terminated in its entirety; thus, federal oversight also ceased at that point. The later locally-initiated and -financed construction of the Nationwide–Dublin connector and widening of Neil Avenue is not somehow transmogrified into a federal project merely because it will relieve some of the same congestion that B–4 would have. Even were the Court to find that B–4 was a part of the SSI Project, the FHWA was not required to consider in its reevaluation of the Spring/Sandusky Interchange Environmental Impact Statement—which it approved on January 29, 1998—the impact of the City's decision to cancel that segment of the project when the B–4 segment was never built by any entity.

Whether B–4 was a part of the SSI Project is a question of fact on which each side has introduced enough evidence to survive summary judgment. The question of whether the de-federalization of one segment of a federal project amounts to improper segmentation when a non-federal actor then builds an *alternative* to that segment is a question of law, and a matter of first impression, for the Court.

## II. FACTS

The Spring/Sandusky Interchange, which is located near downtown Columbus, Ohio, originally opened to traffic in the early 1950s. In 1965, plans were initiated to construct Interstate Route 70 ("I–70") between I–270 and the West Innerbelt. These plans included reconstruction of both the Spring/Sandusky Interchange at I–670 and State Route 315 ("SR 315") and the Mound/Sandusky Interchange, which links I–70 to I–71 and SR 315. The Mound/Sandusky Interchange was completed in 1976. The initial plans for the construction of the SSI Project were completed in 1971. The SSI Project plans were later modified in response to social, economic and environmental changes. The July 11, 1978 Project Program Form for what was to become the SSI Project included in the section entitled "Purpose and Description of Work": "The study will include consideration of the connection of SR 315 to the Front–Marconi one-way pair."

In December 1981, the draft Environmental Impact Statement ("EIS") for the SSI Project was completed. In the 1981 draft EIS, the SSI Project was described as follows:

construction of a new 1.3 mile section of I–670 between Grandview Avenue and State Route 315, the relocation construction of 1.7 miles of I–670 between S.R. 315 and Third and Fourth Streets, and the reconstruction of 2.0 miles of S.R. 315 from I–70 to Third Avenue.... In addition, new streets have been added to complement the local street system.

One of these proposed new streets was identified as the Regional Center Connector from West Goodale Street to Neil Avenue, "with a proposed future extension to Nationwide Boulevard."

The draft EIS considered two build alternatives, alternative G and alternative H, and a no-build option. Alternative G was comprised of four segments: SSI, NIB, WIB and OLEN. Segment SSI represent-

ed the reconstruction of U.S. 33 (Dublin Road) as a four-lane, arterial street. Segment NIB contemplated the widening and reconstruction of existing freeway facilities. Segment NIB also called for the relocation of Goodale Street to the south, "with an eventual connection to Nationwide Boulevard and the North end of downtown." This "eventual connection" was not a part of the 1981 draft EIS; the NIB segment contemplated that "the proposed Goodale Nationwide Connector [would] terminate at Neil Avenue," with I–670 being accessed via Neil Avenue.

The 1981 draft EIS was reviewed by a number of agencies, including the Ohio Historic Preservation Office ("OHPO") and the Advisory Council on Historic Preservation ("ACHP"). Following the initial comment and review process, the City, ODOT and the FHWA decided to move forward with a modified version of alternative G of Segment SSI and alternative G of Segment NIB.

A public hearing was held on February 24, 1982, to discuss the SSI Project and address questions and comments. Seventy-six people attended the hearing. Fifteen interagency comments were received on the draft EIS, including comments from the OHPO and the ACHP. It was determined that the proposed SSI Project would have an effect on several public parks and historic sites, including: the near Northside Historic District, Goodale Park, Rickenbacher Park, Gowdy Park, and the North Market Historic District. The Ohio Pen was not identified as being affected by the proposed SSI Project, as that project was contemplated by 1981 draft EIS. In response to the effects the SSI Project would have on various historic sites, the FHWA, the ACHP, the OHPO and ODOT, in April and May of 1982, entered into a Memorandum of Agreement ("MOA") to mitigate the adverse effects of the SSI Project.

On September 22, 1982, an internal ODOT memorandum was sent by E.N. Burns, P.E., District Deputy Director, to G.A. Weese, Acting Assistant Deputy Director, Program Development Administrator. The purpose of the memorandum was to submit for approval Program Forms (numbers 1440–1452), location maps and CL–181–J forms for the SSI Project. Program Forms 1440 through 1452 corresponded to Design Sections A–1, A–2, A–3, A–4, A–5, B–1, B–2, B–3, B–4, C–1, C–2, C–3 and D, respectively. All Design Sections were designated as part of City/Route/Section FRA–670–1.25. The memorandum noted:

> Design Contract B–4 is presently ineligible for Federal and State participation due to no environmental clearance and is not on a state route or a Federal–Aid route. The City is pursuing an[ ] analysis of the functional classification system for this area. There is a possibility that this proposed route, among others, may become part of the Federal–Aid system. The P.F. is forwarded to become part of the construction contracts for I–670 at 100% City costs.

On October 11, 1982, the City sent a letter regarding "FRA 670/315–1.25/0.00, Spring–Sandusky Interchange, Contract B–4" to the engineering design firm of Parsons, Brinckerhoff, Quade & Douglas ("Parsons"). The letter began: "We are pleased to invite your firm to participate in the development of our Spring–Sandusky Interchange Project by providing design services for Nationwide Boulevard from Neil Avenue to North Front Street." On January 10, 1983, Parsons submitted a proposal for the preparation of contract documents for the construction of the contemplated extension of Nationwide Boulevard.

The Final Environmental Impact Statement ("FEIS") for the SSI Project was distributed for comment on November 23, 1982, and the Record of Decision ("ROD") was issued on January 13, 1983. The FEIS noted that "the roadway improvements proposed for Segment NIB-'G' east of Neil Avenue will be a separate staged element to be constructed after the completion of I-670 west of Neil Avenue."

On April 22, 1983, an internal ODOT memorandum was sent by Eluster L. Fields, P.E., District Deputy Director, to G.A. Weese, Acting Assistant Deputy Director, Program Development Administrator. The "Subject" of the memorandum was "FRA – 670 – 1.25 Revised Cost Breakdown." The memorandum noted: "Since the Nationwide Blvd. Extension (Section B-4) was recently added to the Federal-Aid system, the City now desires that the PE phase include [federal] M fund participation."

On January 17, 1984, the FHWA approved the Environmental Assessment for the extension of Nationwide Boulevard between Neil Avenue and Front Street. On March 23, 1984, the FHWA issued a Finding of No Significant Impact ("FONSI") for the same.[2] The FONSI described the purpose and nature of the project:

> This project will complete the missing section of Nationwide Boulevard which would be created when the Goodale Nationwide Connector is constructed under the Spring–Sandusky Interchange project [I-670/315-1.25/0.00].... The project ... is part of the short-range transportation improvement program of the Mid-Ohio Regional Planning Commis-

sion and the City of Columbus thoroughfare plan.

On April 24, 1984, ODOT and the FHWA approved Parsons as the engineering consultant to "FRA 670/315-1.25/0.00 (Contract B-4), Federal Project No. M-IL18(1)." The City "accepted [the appointment] as a basis for the allocation of Federal Urban System Funds" on May 18, 1984. The City delivered the executed agreement to Parsons on June 15, 1984.[3]

On October 13, 1992, James T. Brunot, Administrator of the Bureau of Consultant Services of the City sent a letter to Fred J. Hempel, Division Administrator of the FHWA. The letter proposed that "Hazardous Waste" from Contracts B-2 and B-4 be reclassified as "Wanted Material," and used within the highway embankments of the SSI Project, rather than be hauled to a licensed landfill at considerable additional cost. The letter began:

> Forwarded herewith is one (1) copy of the Consultant's proposal dated September 30, 1992, regarding the additional work required for the preparation of Phase III—Environmental Site Assessment—Remediation for the eastern sections of the Spring/Sandusky Interchange. The work to be performed under proposed Modification No. 8 will involve Contracts B-1, B-2, B-3, B-4, C-2, and A-4.

On March 29, 1995, the City, Franklin County and others announced the formation of a work group to study the possibility of developing a sports arena. On May 18, 1995, the work group met with the City to discuss options for replacing B-4. On May 30, 1995, Cambridge Systematics, Inc. ("CSI") agreed to revise the scope of its

---

**2.** As contemplated in 1984, B-4 skirted the Ohio Pen site to the north and east.

**3.** Plaintiffs allege that ODOT also listed and managed B-4 as an integral part of the SSI

Project, but the document they cite to for support of this averment does not appear to be a part of the Record before the Court.

work for the Mid–Ohio Regional Planning Commission and the City in studying alternatives to B–4 based upon its "Understanding of Project":

The current design of the Spring–Sandusky Interchange (SSI) includes element B–4, the Goodale/Nationwide Connector between Neil Avenue and Nationwide Boulevard. A proposed 22,000 seat arena would lie in the path of the Connector. The arena and a 30,000 seat stadium would add additional trips to the adjacent highway sections and local streets....

The purpose of this study is to analyze: 1) the traffic impacts of four design options for the Connector; and 2) the impact of additional trip generation on the road network.

[Four] options are to be considered:
1. Baseline—the proposed Connector currently on record;
2. No–Build—termination of the Connector at Neil Avenue, with a suboption including a ramp to a 2,500 car parking garage.
3. Arena Proposal—continuation of the Connector west to Neil Avenue via the prison site; and
4. Option 4—direct[ ] connection to Front Street.

In March of 1996, CSI published its "Spring–Sandusky Interchange B–4 Alternatives Analysis." The study forecasted the results that would flow from embracing each of the four options, but did not make any recommendations.

On August 9, 1996, Jerry Wray, Director of ODOT, sent a letter to Columbus Mayor Gregory S. Lashutka. The letter began:

Thank you for your letter of August 8, 1996 regarding our July 2, 1996 proposal for funding of the Spring/Sandusky project. We are pleased that you, the City Auditor and Columbus City Counsel have come to agreement with ODOT on the proposed division of responsibility and funding. In accordance with the arrangement proposed[,] ODOT will be responsible for funding and construction of the portion of the Spring/Sandusky project west of Neil Avenue and the State of Ohio will also be responsible for the issuance of the bonds[,] with ODOT responsible for 100% of the payments to amortize the revenue bonds. The City, in turn, would be 100% responsible for all projects east of Neil Avenue[,] including right-of-way acquisition. This arrangement of segmenting the administration and responsibilities, in our opinion, more clearly define[s] the roles of the City of Columbus and ODOT on the overall project.

On December 16, 1996, the Columbus City Council enacted an ordinance giving effect to the division of responsibility contemplated in the August 9, 1996 Wray letter. The ordinance noted:

On September 16, 1996, a partnership agreement was signed by members of the City, State, Federal Highway Administration, SSI consultants and various utilities involved agreeing that the Ohio Department of Transportation (ODOT) will assume responsibility for all of the SSI projects west of Neil Avenue.... This agreement also stated that the City would assume responsibility of the SSI projects east of Neil Avenue.

One year prior to the enactment of the cost-sharing ordinance, on December 14, 1995, the Multi–Purpose & Sports Facilities Work Group ("MSG") released its Report. Under the heading, "Parking and Traffic Circulation," the MSG noted:

The proposed Nationwide/Goodale connector must be re-routed to preserve the proposed arena building site. It is assumed that Nationwide Boulevard will be extended through the Ohio Peniten-

tiary site to intersect with Neil Avenue. The Nationwide Boulevard connection to Goodale would be redesigned to permit the arena to be built on the blocks east of the Pen site. It is assumed that the arena will be sited far enough to the east to allow a parking garage to be built on the northern half of the Pen site. A traffic and site circulation study is currently underway by Cambridge Systematics of Massachusetts under the direction of the Mid–Ohio Regional Planning Commission.

On June 20, 1997, the City requested that ODOT delete B–4 from the transportation program. The letter containing the request was carbon copied to Scott McGuire of the FHWA. On July 20, 1998, ODOT invoiced the City for $1,301,892. These funds had been expanded for preliminary engineering and right-of-way acquisition costs for the construction projects east of Neil Avenue, and ODOT was required to repay the funds to the FHWA once it "terminated" the B–4 project. On November 16, 1998, the Columbus City Counsel enacted an ordinance to repay the monies, explaining:

> Prior to the decision not to build the B–4 project, costs were incurred for design, preliminary engineering and land acquisition. These costs were paid with federal funds administered through ODOT. Under federal guidelines the City is required to reimburse ODOT $1,301,892.00.

.    .    .    .    .

The City is proceeding with the widening of Neil Avenue (Goodale to Long), the westward extension of Nationwide Boulevard and a planned extension of Vine Street to accommodate the traffic needs of the proposed development and daily commuter traffic.

In January of 1998, ODOT reevaluated the 1982 FEIS regarding the impact of the SSI Project on the human and natural environment. The reevaluation and design modifications were accepted by the FHWA on January 29, 1998, with several conditions. The reevaluation noted that B–4, while referenced by the FEIS, was separate from the SSI Project, and was not included in the FEIS. On December 3, 1998, a public meeting was held as part of the review process.

On March 16, 1999, a second reevaluation of the FEIS was presented. This second reevaluation went to greater lengths to explain that B–4 was always separate from and independent of the SSI Project. In January of 2000, the FHWA, ODOT, the OHPO, the ACHP and the City produced an Amended MOA to supercede the 1982 MOA. This Amended MOA was executed by the FHWA, ODOT, the OHPO and the City on January 26, 2000, and by the ACHP on February 2, 2000. Plaintiff Dennison Place Association has been invited to sign the Amended MOA, but has declined to do so. Neither Plaintiff Brewery District Society nor Plaintiff Malcolm Cochran has been invited to sign the Amended MOA. The Ohio Pen site is not a subject of the Amended MOA.

The FHWA did not consult with the ACHP or the OHPO on the effects of the withdrawal of B–4 before the Ohio Pen was demolished in February of 1998. Nor did it consult with the organizations on the effects of the City's construction of the Nationwide Boulevard extension and widening of Neil Avenue. The construction of the SSI Project continues to date. Construction of the B–2 connector, which has its eastern terminus at Neil Avenue, is complete.

Plaintiffs allege that Defendant's January 29, 1998 acceptance of the reevaluation of the SSI Project's FEIS, and the federal funds that continued to flow to the SSI

Project subsequent to that acceptance and without consultation with the ACHP regarding the construction of the "B–4 alternative," formed "assistance to the City of Columbus." Plaintiffs further allege that because Defendant failed to consult with the ACHP prior to accepting the reevaluation and/or before "allowing" the City to construct its "B–4 alternative," it violated 16 U.S.C. § 470h–2(k) and 49 U.S.C. § 303(c)(2).

Defendant denies that it violated any of its statutory obligations. Defendant contends that it had no duty or authority to prevent the demolition of the Ohio Pen, and that the Ohio Pen site was not adversely affected by the SSI Project. Defendant asserts that it has consulted with—and continues to consult with—the ACHP where its federal actions have the potential to affect historic resources. Defendant also asserts that its acceptance of the reevaluation of the FEIS and the continuation of the SSI Project conformed with federal regulations 23 C.F.R. §§ 771.129 and 771.130.

### III. STANDARD OF REVIEW[4]

In evaluating cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir.1994). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d

240 248 (6th Cir.1991) (citing *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed only by one party to the litigation. *See Taft Broadcasting*, 929 F.2d at 248. Summary judgment is therefore appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir.1993) (citation omitted). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding

---

4. The parties dispute whether this Court's eventual review on the merits of the agency action at issue here should be governed by 5 U.S.C. § 706(1), 5 U.S.C. § 706(2)(A) or 5

U.S.C. § 706(D). At this stage in these proceedings, however, the proper standard of review is clear.

summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). Furthermore, the existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *see also Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995).

## IV. ANALYSIS

### A. Relevant Statutes

This case involves the FHWA's statutory obligations in dealing with projects that may affect the human or natural environment. The statutes at issue here are 49 U.S.C. § 303(a) ("section 4(f)") and 16 U.S.C. § 470.

Section 4(f) provides, in relevant part:

> It is the policy of the United States Government that special effort should be made to preserve ... historic sites.

> .     .     .     .     .

> The Secretary may approve a transportation program or project ... requiring the use of ... land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the ... site) only if—

> (1) there is no prudent and feasible alternative to using that land; and

> (2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from the use.

49 U.S.C. § 303(a). Thus, a transportation project requiring the land of an historic site may only be approved if includes all possible planning to minimize harm to the historic site. *Id.*

Furthermore, all federal agencies have an obligation to assess the effect of any undertaking on historical sites that are in or may be eligible for inclusion in the National Register, and to seek comment from the ACHP before expending federal funds on such undertakings:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f ("section 106").

Federal agencies also have the obligation to deny assistance to any applicant for federal funds looking to make an end-run around section 106 review:

Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant who, with intent to avoid the requirements of section 470f of this title, has intentionally significantly adversely affected an historic property to which the grant would relate, or having legal power to prevent it, allowed such significant adverse effect to occur, unless the agency, after consultation with the [Advisory] Council [on Historic Preservation], determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant.

16 U.S.C. § 470h–2(k).

Plaintiffs' allegations here are based on the proposition that the FHWA, by continuing the uninterrupted funding of the SSI Project after the City had withdrawn B–4, granted assistance to the City in its end-run around section 106 review of its then-proposed demolition of the Ohio Pen site, in violation of 16 U.S.C. § 470h–2(k).[5] Plaintiffs also note—in their summary judgment papers, for the first time—that the FHWA's action is even more likely to be violative of section 4(f).[6]

## B. Plaintiffs' Motion for Summary Judgment

Plaintiffs seek an Order requiring Defendant FHWA, as a condition of continuing to fund the SSI Project, to seek section 4(f) review, section 106 review and consultation and/or comments of the ACHP, pursuant to section 470h–2(k), with respect to possible mitigation of adverse effects on the Ohio Pen site. Plaintiffs also request that the Court retain jurisdiction over the

matter to review the disposition of this case after the completion of such review, consultation and/or commentary.

■ A finding by this Court that B–4 was indeed a part of the SSI Project is a necessary predicate to Plaintiffs' unlawful segmentation argument. This is so because if B–4 was an independent project, then there would be no way to consider its locally-financed and -constructed "replacement" as a part of the SSI Project, and thus federal in nature. If the "B–4 alternative" of which Plaintiffs complain is not a federal project, it need not comply with the federal strictures Plaintiffs would enforce. *Historic Pres. Guild of Bay View v. Burnley*, 896 F.2d 985, 988 (6th Cir.1989) (noting that when a "project is a state project, ... the requirements of federal law are not required to be met."). Because Defendant submits evidence that, viewed in the light most favorable to it, could establish the independence of the B–4 project, and thus the non-federal nature of the "B–4 alternative," the Court cannot grant Plaintiffs' Motion for Summary Judgment.

### 1. B–4's Relationship to the SSI Project Presents a Genuine Issue of Material Fact

As recognized by the Sixth Circuit in *Bay View*, 896 F.2d at 992, the Department of Transportation has promulgated regulations setting forth the minimum criteria of independence a proposed undertaking must satisfy in order to be evaluated in a separate EIS or FONSI:

In order to ensure meaningful evaluation of alternatives and to avoid commit-

---

5. This Court recognized the viability of such a claim in its ruling on the FHWA's Motion To Dismiss. *Brewery Dist. Soc'y v. Fed. Highway Admin.*, 996 F.Supp. 750, 756 (S.D.Ohio 1998).

6. Plaintiffs point out that Scott McGuire was asked about section 4(f) on the stand during the January 29, 1998 preliminary injunction hearing; the question to which they apparently refer, however, was withdrawn.

ments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f). The ultimate issue that these criteria help to evaluate is "whether the project segment has independent justification or whether the construction of [the span at issue] is dependant upon construction of the entire highway." *Bay View*, 896 F.2d at 991 (quotation omitted). To that end, the Sixth Circuit has adopted the Fifth Circuit test of independence, which incorporates much of § 711.111(f):

> The proper inquiry involves a balancing of several factors, including the question of whether the segmented portion is a mere extension of a federal road, or connective link; whether, even if it is an extension or connection between two federal roads, it nevertheless has independent utility; whether the segment has logical termini; and whether the segment serves primarily local needs.

*Id.* (quoting *Hawthorn Envtl. Pres. Ass'n v. Coleman*, 417 F.Supp. 1091, 1100 (N.D.Ga.1976), *aff'd*, 551 F.2d 1055 (5th Cir.1977)).

In the matter *sub judice*, the FHWA has presented enough evidence to make out a *prima facie* case for the independence of B–4 on each of the 111(f) elements. Assuming the absence of the "rest" of the SSI Project, B–4, as originally contemplated, would have connected downtown Columbus, at Nationwide Boulevard and Front Street, to the near northside district, at Neil Avenue. A finder of fact could readily conclude, based upon the traffic patterns in the Columbus metropolitan area in the absence of B–4, that these were logical termini and that the project would have had utility even if no additional transportation improvements in the area were made.[7] As to the additional factors in the *Bay View* test, the presence of Neil Avenue between B–2 and B–4 lends support to the argument that B–4 is not merely an extension of B–2,[8] and the connection of the near northside district to downtown—if not the connection of the "rest" of the SSI Project to downtown—would appear to serve primarily local needs.

While it is true that a project segment could satisfy all of the 111(f) and *Bay View* criteria and still not be an independent project,[9] Defendant has adduced enough evidence to avoid that finding, as a matter of law, here. As explicated in the "Facts" section of this Opinion, *supra* Part II, it is

---

**7.** Neither side contends that prong three of 111(f) is an issue in this case.

**8.** It is important to note that "even if [the challenged segment] is an extension or connection between two federal roads," it still may be found to be an independent project under the *Bay View* test. *Bay View*, 896 F.2d at 991.

**9.** If, for example, the B–4 "S-curve" had been included in the 1982 FEIS as part of project

segment B–2, and the City decided in 1997 to "de-federalize" and construct the "S-curve" on its own, the stretch of roadway at issue would be exactly the same as the one just discussed as having satisfied the 111(f) and *Bay View* criteria, but, due to its genesis as an undifferentiated part of a larger federal project, it could not reasonably be classified as an independent project.

undisputed that B–4 was approved after, and separately from, the "rest" of the SSI Project. Furthermore, Defendant has adduced evidence—such as the 1998 and 1999 reevaluations of the SSI Project FEIS, each of which asserted that B–4 was, and had always been, separate from the SSI Project—that could lead a finder of fact to determine that B–4 remained separate from, i.e., was never annexed by, the SSI Project. Because Plaintiffs' unlawful segmentation argument is premised upon the "fact" that B–4 was a part of the SSI Project, the Court **DENIES** Plaintiffs' Motion for Summary Judgment.

## C. Defendant's Motion for Summary Judgment

Defendant does not dispute that the SSI Project was—and is—a large-scale federal highway project, subject to all relevant historical protection statutes. Rather, it presses two independent theories in support of its Motion for Summary Judgment. First, the FHWA claims that B–4 has always been separate from and independent of the SSI Project. Thus, when the City canceled B–4, it terminated an entire small project; it did not segment a large one. If there has been no segmentation, there, *a fortiori*, can have been no unlawful segmentation. Second, Defendant argues that even if this Court were to find that B–4 was a part of the SSI Project, there would still have been no unlawful segmentation because B–4 was not simply "defederalized," it was never built. Defendant's first argument falls easily; its sec-

ond presents a matter of first impression for the Court.

### 1. B–4's Relationship to the SSI Project Presents a Genuine Issue of Material Fact

In order for Defendant's first line of argument in support of its Motion for Summary Judgment to succeed, this Court would have to find that B–4 was at all times separate from the SSI Project. *See Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir.1998) (holding that 23 U.S.C. § 145 did not authorize "state and local officials, with FHWA approval, to 'defederalize' a segment of a 'major federal action' by foregoing federal funding in order to avoid compliance with NEPA"); *Scottsdale Mall v. State of Indiana*, 549 F.2d 484, 489 (7th Cir.1977) (same); *see also Southwest Williamson County Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 286 n. 17 (6th Cir.2001) (citing with approval *Ross* and *Scottsdale Mall*). Though Plaintiffs do not dispute that B–4 went through the environmental approval process separately from the "rest" of the SSI Project, they have adduced more than enough evidence that B–4 was annexed by the SSI Project sometime between 1984 and 1997 to survive summary judgment on the point.[10] For example, Plaintiffs have introduced internal ODOT memoranda that seem to treat B–4 as part of the SSI Project, multiple letters tending to indicate that both ODOT and the City considered B–4 a part of the SSI Project, evidence that both B–4 and the "rest" of the SSI Project were classified as "FRA 670/315–

---

**10.** Defendant asserts that so long as there is evidence tending to show that B–4 satisfies the 111(f) criteria, this Court must find as a matter of law that B–4 is an independent project. 23 C.F.R. § 771.111(f) is not, however, a safe harbor provision; rather, it circumscribes the *minimum* standards an undertaking must satisfy before it is eligible for a separate environmental evaluation. It is

clear that an undertaking could satisfy all of the 111(f) criteria—and even the additional *Bay View* criteria as well—and still not be an independent project. *See supra* footnote 10. Furthermore, Plaintiffs have introduced evidence in support of their assertions that Neil Avenue is not a logical terminus for B–4 and that the utility of B–4 is dependent upon the existence of B–2.

1.25/0.00, Federal Project No. M-IL181(1)," evidence that independent contractors believed B–4 was a part of the SSI Project, and City ordinances that easily could be read to evince an understanding that B–4 was part of the larger SSI Project.[11]

Defendant relies heavily on *Bay View* for support of its argument that it is entitled to judgment as a matter of law because the road that was built cannot be considered a federal road. The facts in *Bay View*, however, were much more amenable than those here to an understanding that the challenged segment was not a part of a "major federal action." In *Bay View*, there had never been any federal funds used in connection with the challenged segment; here, federal monies were used both to pay for preliminary engineering design work and for the acquisition of rights-of-way, and were not repaid until more than a decade after they began to flow. Additionally, the project at issue in *Bay View* did not on its face appear to be a part of a large, coordinated federal scheme; nor could the *Bay View* Court find any intent to evade federal laws or regulations—an intent that could be inferred here. Furthermore, even in affirming the district court, the *Bay Guild* opinion boils with the displeasure of the Sixth Circuit at the grant of summary judgment: it seems the district court was affirmed only because the Sixth Circuit could not see how any remediation or mitigation of adverse effects could reasonably be affected. In the matter *sub judice*, on the other hand, the Spring Street facade of the most

significant Ohio Pen buildings has apparently been preserved in such a manner that it could be reused at a later time, in mitigation of the adverse effects on the Ohio Pen site.

Because there is a genuine issue of material fact as to whether B–4 was a part of the SSI Project, Defendant's argument that there could be no unlawful segmentation in this case because, as a matter of law, there was no segmentation at all, fails.

**2. There Is a Possibility of an Unlawful Segmentation When the Road Built by the Non–Federal Entity Is an Alternative to the "De–Federalized" Segment**

The last issue remaining at the summary judgment stage of this litigation is whether unlawful segmentation can occur in the absence of the construction of the allegedly "federalized" segment. Though whether the "alternative" is a *replacement* for the "federalized" segment or an *entirely new project* presents a factual question for the finder of fact, the predicate question of whether such a distinction even matters is one of law which should be addressed at this time. This question has not been addressed by legislators, bureaucrats or the judiciary, and the Court recognizes that it will be "making new law" whatever its answer. That is, the Court must either expand the class of actions subject to a charge of unlawful segmentation or strictly limit that class to the state-builds-the-exact-same-road-as-feds-would-have situation already circumscribed.

---

**11.** Plaintiffs do not assert that a *de jure* annexation of B–4 by the SSI Project ever occurred, and Defendant does not make the argument that one would be necessary for B–4 to become "part of" the SSI Project. In the course of making its argument that B–4 at all times maintained its independence from the SSI Project, the FHWA implicitly concedes that a *de facto* merger between two previously independent projects could occur. The Court finds this concession to be proper: it is all but inconceivable that the FHWA would institute a formal project-merger procedure when such a process would serve no purpose other than to subject it to judicial review where it would otherwise be immune.

Defendant here argues that, assuming *arguendo* B–4 was a part of the SSI Project, it is still entitled to summary judgment because it is uncontested that no entity ever constructed B–4. Since B–4 was never built, Defendant's reasoning goes, the prohibition against segmenting off and "de-federalizing" one piece of a project that has become imbued with federal character, in an effort to avoid the strictures of federal law, in order to construct that segment with non-federal funds is of no moment in this matter. Plaintiffs counter that there is no reason to treat the "B–4 replacement" that the City did build any differently than the Court would have treated the local construction of B–4 itself; that is, this Court should enforce compliance with the federal historical protection statutes.

■ It is established that a state or local entity may build its own projects without having to satisfy the requirements of federal law. *See Bay View,* 896 F.2d at 988. It is also established that a state or local entity may not avoid the requirements of federal law by taking over and constructing part of a federal project. *See Ross,* 162 F.3d at 1051; *Scottsdale Mall,* 549 F.2d at 489; *see also Southwest Williamson County,* 243 F.3d at 286 n. 17. The question here, assuming *arguendo* that the Nationwide–Dublin connector is indeed the "B–4 replacement" Plaintiffs claim, is whether federal strictures must be complied with when the local entity takes over a piece of a federal project and then alters it before constructing it.

Considering the hypothetical example of the City canceling B–4 and then seeking to use its own funds to construct, in the same time-frame as was contemplated for B–4, a road of quality and dimensions identical to B–4, with the only difference between the two being that the "new" road is at all points two feet to the east of the course set for B–4, it seems apparent that *de minimis* alterations to the "old" federal plan cannot be enough to insulate an otherwise "federalized" project from judicial review. At the same time, it is obvious that the City could terminate B–4 and then, ten years down the road, use its own funds to construct a road unrelated to B–4 in purpose or location. The question before the Court, however, is closer than either of these hypothetical examples.

■ Where the "federalized" road to be build is not functionally identical to the road contemplated in the federal project, but is designed to serve the same purpose as the road it is replacing, is compliance with 49 U.S.C. § 303(a) and 16 U.S.C. § 470 required? This Court finds, based upon the language and purpose of those two statutes, that the answer must be yes, with the following caveats:

1. fulfilling the role of the canceled federal project segment must be the primary purpose of the "federalized" road (a question of fact); and

2. in order to succeed, the plaintiff must at least establish a *prima facie* case of "functional replacement," consisting of evidence tending to show:

   a. the termini of the "federalized" road are close enough to the termini of the canceled federal project segment to provide similar levels of accessibility;

   b. the capacity of the "federalized" road is approximately that of the canceled federal project segment;

   c. the construction of the "federalized" road is not so remote in time from that contemplated for the canceled federal project segment that it could realistically have become necessary due to new traffic patterns; and

d. the utility of the "major federal project" of which the canceled project segment was a part is substantially enhanced by the construction of the "federalized" road.

■ Because the Nationwide–Dublin connector in the present case is arguably intended primarily to serve the same role as B–4, because the "B–4 replacement" satisfies all four of the *prima facie* elements of "functional replacement," and because a genuine question of material fact exists as to the relationship between B–4 and the SSI Project, the Court **DENIES** Defendant's Motion for Summary Judgment.

### V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**